Marsha WALKER, on behalf of herself and all others similarly situated Plaintiff

v.

SHIELD ACQUISITION CORP., Hagemeyer P.P.S. North America, Inc. and David G. Gundling Defendants.

No. CIV. A. 1:00 CV 0481 ODE.

United States District Court, N.D. Georgia, Atlanta Division.

March 30, 2001.

---

William S. Lerach, Esq., Mark Solomon, Esq., Eric Alan Isaacson, Esq., Henry Rosen, Esq., Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Martin D. Chitwood, Esq., Chitwood & Harley, Atlanta, GA, Paul J. Geller, Esq., Cauley Geller Bowman & Coates, Boca Raton, FL, for Plaintiff.

Michael Scott French, Esq., David L. Pardue, Esq., Kritzer & Levick, Atlanta, GA, James E. Farnham, Esq., Stacy Colvin Taylor, Esq., Edward J. Fuhr, Esq., Hunton & Williams, Richmond, VA, for Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

The instant federal securities litigation is presently before the court on Defendants' motion to dismiss and Plaintiff's motion for appointment of a lead plaintiff and approval of lead counsel. For the reasons set forth below, the motion to dismiss is granted. The remaining motion is dismissed as moot.

The relevant facts in this case are set forth in the Complaint or are judicially noticed as described below. Shield Acquisition Corporation ("Shield"), a Texas corporation, acquired most of the stock of Vallen Corporation ("Vallen"), a Texas corporation, pursuant to a tender offer which closed December 17, 1999 (the "Tender Offer"). Shield was a wholly owned subsidiary of Hagemeyer P.P.S. North America, Inc. ("Hagemeyer"),[1] which in turn was a subsidiary of Hagemeyer NV, a company organized under the laws of the Netherlands. [Compl. ¶ 12; Ex. 99.A.1 to Schedule 14D–1 ("Offer to Purchase") at 16].

Marsha Walker ("Plaintiff") owned and tendered 500 shares of Vallen common stock to Shield and received $25.00 per share as promised by the Tender Offer documents. [Compl. ¶ 10]. She filed the instant suit for damages seeking to represent a class of tendering shareholders, alleging that certain Vallen executives ("Vallen Insiders") who owned stock improperly received additional consideration for their shares pursuant to the Tender Offer. [*Id.* ¶¶ 24–5, 32]. Her claim is that all Plaintiffs should receive the per-share equivalent of that received by the Vallen Insiders. [*Id.* at ¶¶ 7, 32]. According to the Complaint the Vallen Insiders were:

| Individual | Beneficial Ownership Interest | Position |
|---|---|---|
| James W. Thompson | 137,965 Vallen shares | President and CEO of Vallen |
| Leighton J. Stephenson | 16,481 Vallen shares | Vice President, Secretary and Treasurer of Vallen |
| David G. Key | 24,738 Vallen shares | Former Vice President and General Manager of Vallen |
| Robert W. Bruce | 173 Vallen shares | Employee and Director of Vallen Knowledge Sys. Group, a division of Vallen, (son of Chairman of the Board). |

[Complaint ¶ 12].[2]

The factual background is as follows. Vallen began actively seeking out potential third party-purchasers beginning in March, 1999. [Compl. ¶ 14]. By October, 1999, serious discussions were ongoing between Hagemeyer and Vallen concerning Hagemeyer's acquisition of Vallen. [*Id.*] On October 20, 1999, Vallen's Board of Directors approved bonuses, denominated

"Retention and Transition Awards," which would be paid to thirteen key employees in the event of a change in control. [Schedule 14D–9 at 4–5]. The Vallen Insiders were four of these thirteen employees. [*Id.*].

On November 14, 1999, Hagemeyer,

---

**1.** Defendant David G. Gundling ("Gundling") is President and Chief Executive Officer of Hagemeyer. [Compl. ¶ 13].

**2.** While the complaint alleges that Robert W. Bruce held 173 shares of Vallen stock, references to Bruce's holdings in the tender offer documents reflect that he held a much larger amount of stock. The apparent typographical error in the complaint has no material impact, one way or the other, on the outcome of Defendants' motion to dismiss.

Shield[3] and Vallen entered into an Agreement and Plan of Merger ("Merger Agreement"). [Compl. ¶ 17]. The parties agreed that Shield would make a tender offer for all outstanding shares of Vallen at $25.00 per share. [*Id.*]. The Tender Offer was conditioned on Shield's acquiring at least two thirds of the outstanding stock. [*Id.* at ¶ 16]. The tender of 55–56% percent already had been locked up through a separate agreement with Leonard J. Bruce, Chairman of Vallen's Board of Directors, who held that amount of outstanding stock. [*Id.;* Schedule 14D–9 at 3]. The Vallen Insiders collectively held 3.3% of Vallen's stock. [Compl. ¶ 16].

The Merger Agreement stated that upon successful completion of the Tender Offer, the merger of Shield and Vallen would be accomplished under the provisions of the Texas Business Corporation Act ("TBCA"). [Ex. 99.C.1 to Schedule 14D–1 ("Merger Agreement") § 2.1]. If Shield received more than 90% of Vallen's shares in the Tender Offer, a "short-form" statutory merger would occur whereby Shield could be merged into Vallen without the necessity of further action by the board of directors or a shareholders' vote. [Merger Agreement § 2.1; Offer to Purchase at 2, 19, 31–2; TBCA Art. 5.16]. Pursuant to an Option Agreement, if Shield did not receive at least 90%, Shield would have an option to purchase enough newly issued Vallen shares, not to exceed 10% of the outstanding shares, to enable it to reach the 90% threshold. [Ex. 99.C.5 to Schedule 14D–1].

The Merger Agreement made provision for valuing the shares of any dissenting shareholders under § 5.12 of the TBCA.

[Merger Agreement § 2.2(d)]. It stated that Vallen's directors, officers and employees would remain as such following the tender offer, until replaced according to procedures set out in the Merger Agreement. [Merger Agreement § 1.4]. Vallen agreed it would use best efforts to obtain the resignation of members of the Board after the merger so as to accommodate Hagemeyer's designees to the Board. [*Id.*]. The names of Hagemeyer's four designees to the then-existing six-member Board of Directors were stated in the offering document. [Offer to Purchase at 31, I–3; Schedule 14D–9 at A–2].

The Merger Agreement stated that the surviving corporation, which was to be Vallen, would honor all existing written commitments concerning "retention and transition" payments previously adopted by Vallen for the benefit of current or former officers, directors, or employees. [Merger Agreement §§ 2.1; 8.10].

On November 15, 1999, Vallen and Hagemeyer announced the upcoming Tender Offer. [Compl. ¶ 18]. On or about November 19, 1999, Hagemeyer and Shield filed with the Securities and Exchange Commission a Schedule 14D–1 Tender Offer Statement pursuant to Section 14D(1) of the Securities Exchange Act of 1934 ("Tender Offer Statement"). [*Id.* ¶¶ 2, 19]. Vallen filed a Schedule 14D–9 Solicitation/Recommendation Statement pursuant to Section 14(d)(4) of the Securities Exchange Act of 1934 ("Solicitation/Recommendation Statement"). [*Id.* ¶ 4]. The Tender Offer Statement included a copy of the Merger Agreement.

The Tender Offer commenced on November 19, 1999, when Vallen sent all

---

**3.** Presumably Shield was incorporated by Hagemeyer for the purpose of conducting the Tender Offer. [Compl. ¶ 36].

shareholders the Solicitation/Recommendation Statement. [*Id.* ¶ 19]. It described the $25.00 per share cash offer and also disclosed the retention and transition awards which would be honored for Vallen's key employees if the merger was consummated [*Id.* ¶¶ 4, 19]. Specifically it provided:

> By resolution of the Compensation Committee of the [Vallen] Board on September 2, 1999, and by unanimous written consent of the [Vallen] Board on October 20, 1999, the Company granted Retention and Transition Awards in the aggregate amount of $1,427,025 to be paid to 13 specified key employees upon a Change in Control (as defined in the resolutions adopted by the Compensation Committee on September 2, 1999). Of the thirteen employees awarded Retention and Transition Awards, four were directors or executive officers of the Company. Their names and the amounts of Retention and Transition Awards to which they are entitled (as a result of the transactions contemplated in the Merger Agreement) are listed below:
>
> | | |
> |---|---|
> | James W. Thompson | $250,000 |
> | Leighton J. Stephenson | $125,000 |
> | David G. Key | $125,000 |
> | Robert W. Bruce | $125,000 |

[Schedule 14D–9 at 5; *see also* Compl. ¶ 4].

The Vallen Board and the Vallen Insiders had approved and recommended the Tender Offer. [Compl. ¶ 19; Schedule 14D–9 at 6–11]. The Tender Offer Statement indicated that Hagemeyer had approved the payment of the transition and retention awards. [Compl. ¶ 22; Offer to Purchase at 25].

The Tender Offer concluded on December 17, 1999. [*Id.* ¶ 1]. According to the complaint, Shield was successful in acquiring at least the requisite two-thirds of Vallen's stock.[4] [*Id.* ¶¶ 16, 23]. At that time, Shield paid all shareholders including the Vallen Insiders $25.00 cash per share tendered. [*Id.* ¶¶ 1, 19]. Subsequently, the merger of Shield and Vallen under the provisions of the Texas Business Corporation Act took place. [Merger Agreement § 2.1]. Vallen was the surviving corporation, and was then wholly owned by Hagemeyer. [*Id.*]. The transition and retention awards were paid. [Compl. ¶¶ 5, 6].

Plaintiff's Complaint alleges that the transition and retention awards were a ruse for additional payments to Vallen Insiders for their stock, in violation of § 14(d)(7) of the 1968 Williams Act Amendments ("The Williams Act") to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(d)(6)-(7) (1994) ("The Exchange Act") and SEC Rule 14d–10(a)(2). Plaintiff seeks damages for herself and putative class members in an amount equal to the alleged additional per-share consideration paid to the Vallen Insiders under the so-called "best price" provision of The Williams Act and Rule 14d–10.

Section 14(d)(7) of The Williams Act provides:

> *Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation*

[Def. Motion to Dismiss at 1].

---

**4.** Defendants state that Hagemeyer obtained 99% of Vallen's outstanding common stock.

for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

15 U.S.C. § 78n(d)(7) (emphasis added). Rule 14d–10, promulgated thereunder, states:

(a) *No bidder shall·make a tender offer unless:*

(1) The tender offer is open to all security holders of the class of securities subject to the tender offer; and

(2) *The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.*

17 C.F.R. § 240.14d–10(a)(2) (emphasis added).

Rule 14d–2(a) provides:

A tender offer shall commence for the purposes of section 14(d) of the Act and the rules promulgated thereunder at 12:01 A.M. on the date when the first of the following events occurs:

(1) The long form publication of the tender offer is first published by the bidder pursuant to Rule 14d–4 (a)(1);

(2) The summary advertisement of the tender offer is first published by the bidder pursuant to Rule 14d–4 (a)(2);

(3) The summary advertisement or the long form publication of the tender offer is first published by the bidder pursuant to Rule 14d–4(a)(3);

(4) Definitive copies of a tender offer, in which the consideration offered by the bidder consists of securities registered

pursuant to the Securities Act of 1933, are first published or sent or given by the bidder to security holders; or

(5) The tender offer is first published or sent or given to security holders by the bidder by any means not otherwise referred to in paragraphs (a)(1) through (4) of this rule.

17 C.F.R. § 240.14d–2(a).[5] While neither The Williams Act nor any Rule promulgated thereunder specifies an end-time for a tender offer, Rule 14e–1(a) requires all tender offers to remain open for at least twenty days from the date such tender offer is first published or sent to security holders. 17 C.F.R. § 240.14e–1(a).

Defendants move to dismiss on the ground that the Complaint, when considered in conjunction with the aforesaid judicially noticed facts, fails to allege a violation of either § 14(d)(7) of The Williams Act or Rule 14d–10(a)(2) promulgated thereunder. Specifically, Defendants argue the Complaint fails to allege that there was a "variation" of the share price during the term of the Tender Offer as contemplated by § 14(d)(7). The Tender Offer specified $25.00 per share to all shareholders, and this never changed during the Tender Offer. Defendants also argue that the retention and transition awards were promised in the Merger Agreement before the Tender Offer began and were paid after the Tender Offer ended, and thus did not occur "during the tender offer" prohibited by Rule 14d–10(a)(2).

In response, Plaintiff admits that the retention and transition awards were promised prior to November 19, 1999, the official commencement date of the Tender

---

**5.** This Rule has been subsequently amended, but the version quoted above was in effect during Shield's Tender Offer.

Offer. However, Plaintiff alleges that the agreement to pay the retention and transition awards was an integral part of the Tender Offer, specifically by linking the agreement to pay the awards to the Vallen Insiders' endorsement of the Tender Offer. Consequently, Plaintiff asserts that the Merger Agreement and Tender Offer should be viewed as one integrated transaction. In that fashion, the Merger Agreement's conditional promise to pay the retention and transition awards in the event of a successful merger would be "during the tender offer" for purposes of § 14(d)(7) and Rule 14d–10(a)(2). Plaintiff also argues that the awards to the Vallen Insiders represented additional, improper consideration for their shares and amounted to a prohibited "variation" from the stated $25.00 per share Tender Offer price.

As an initial matter, the court has judicially noticed the contents of the Tender Offer Statement and the Solicitation/Recommendation Statement to ascertain the structure of the tender offer and merger. These documents are attached to Defendants' motion to dismiss and as noted were filed with the SEC. A copy of the Merger Agreement is attached to and forms a part of the Tender Offer Statement. The court may judicially notice such SEC filings, even though they are matters outside the complaint, when considering a motion to dismiss. *Bryant v. Avado Brands Inc.,* 187 F.3d 1271 (11th Cir.1999), relying on *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017–18 (5th Cir.1996) and *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

First, the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist. Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated. Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents. Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements. Finally, we believe that under such circumstances, a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2).... We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.

*Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991). Further, the Eleventh Circuit has held "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claims, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendants attaching such documents to the motion will not require conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross Blue Shield of Florida,* 116 F.3d 1364, 1368 (11th Cir.1997).

Turning to the substance of the motion to dismiss, there are no decisions of the United States Court of Appeals for the Eleventh Circuit which address the question whether awards to key executives in a merger following a successful tender offer may be deemed to constitute additional consideration for their shares so as to trigger a right of recovery by other tendering shareholders under The Williams Act. In their briefs, the parties discuss a number of decisions of other circuits. Plaintiff relies primarily on *Epstein v. MCA Inc.*, 50 F.3d 644 (9th Cir.1995), *r'vd on other grounds sub nom. Matsushita Elec. Indus. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), (finding that transactions outside the Tender Offer period must be factually analyzed in each instance to determine whether they are an "integral part" of the Tender Offer for purposes of Rule 14d–10); Plaintiffs further cite the Second Circuit's opinion in *Field v. Trump*, 850 F.2d 938 (2d Cir.1988) (holding that where tender offer began, then was called off for 24 hours during which time special arrangements were made with one shareholder, then began again the next day, a question of fact existed as to whether the special arrangements had been made "during the tender offer" in violation of The Williams Act). Defendants primarily rely on *Lerro v. Quaker Oats*, 84 F.3d 239 (7th Cir.1996) (holding that only transactions literally within the tender offer period are regulated by § 14(d)(7) of The Williams Act and Rule 14d–10); Defendants also cite to *Kramer v. Time, Inc.*, 937 F.2d 767 (2d Cir.1991) (holding that benefit given to

executives in second-step statutory merger following tender offer did not constitute additional consideration for their shares in violation of § 14(d)(7) of The Williams Act or Rule 14d–10 because the tender offer and merger were separate transactions and the benefits were paid by the target corporation, not the offeror) and *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir.1985) (holding "street sweep" purchases within hours after the termination of a tender offer are not subject to the Rules promulgated under The Williams Act).

As discussed below, the court finds the reasoning of *Kramer* and *Lerro* particularly persuasive as those cases are factually analogous to the instant case. *Epstein* is factually dissimilar in that it involved only a tender offer and no subsequent merger. *Field* is factually inapposite. Also, the court is not persuaded by *Epstein's* broad holding that in each case, transactions occurring prior to the beginning of the tender offer must be examined to determine if they should be deemed "integral" to the tender offer.

Plaintiff primarily relies on the reasoning in *Epstein v. MCA, Inc.*, 50 F.3d 644, 652–53 (9th Cir.1995)[6] in arguing that the retention and transition awards paid pursuant to the Merger Agreement were integral to the tender offer and thus triggered the "best price" provision of The Williams Act. In *Epstein*, the United States Court of Appeals for the Ninth Circuit adopted a flexible test for the definition of "tender offer" that focuses not on timing but on whether the transaction in question was an

6. In *Matsushita Elec. Indus. Co. Ltd. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), the United States Supreme Court held that a Delaware Chancery Court's class action settlement involving the same parties barred Plaintiff's claims which had been before the Ninth Circuit in *Epstein*. The case was remanded to the Ninth Circuit with instructions to dismiss. The Supreme Court had not granted certiorari to review the substantive ruling interpreting Rule 14d–10 and did not address it in its opinion.

"integral part of the tender offer." *Epstein* 50 F.3d at 654.

The facts of the Ninth Circuit case were as follows. In 1990, Matsushita Electrical Co. Ltd. acquired MCA, Inc. pursuant to a tender offer of $71 per share of MCA common stock. No merger was involved. The shareholder-plaintiffs alleged that two MCA Insiders, Wasserman (CEO) and Sheinberg (COO), received additional, illegal consideration for their stock pursuant to separate agreements with Matsushita executed shortly before the tender offer was announced. They sued under the best price provision of The Williams Act. The tender offer documents reflected that Wasserman would be able to exchange his shares of MCA tax-free after the tender offer was completed for shares in another entity. Sheinberg would receive $21 million, pursuant to a separate agreement ostensibly designed to cash out certain stock options, in addition to the $71.00 tender price, if the tender offer succeeded. *See id.* at 647–48, 653, 657.

With respect to the Wasserman transaction, the defendant argued that "liability under Rule 14d–10 boils down to a pure question of timing: the Rule is simply a 'mechanical provision' concerned with 'payments to shareholders of a target corporation only during a specifically-defined tender offer period'." *Id.* at 654. The Ninth Circuit rejected such an argument and held:

> Although Matsushita argues that Rule 14d–10 is designed to operate only during a "specifically-defined tender offer period," neither the phrase "tender offer period" nor a specific time frame is to be found in the Rule's text. To be sure, section (a)(2) of the Rule prohibits paying one security holder more than another "during such tender offer." But the term "tender offer," as used in the federal securities laws, has never been interpreted to denote a rigid period of time. On the contrary, in order to prevent bidders from circumventing the Williams Act's requirements, Congress, the SEC, and the courts have steadfastly refused to give the term a fixed definition. Instead, we have held that "[t]o serve the purposes of the Williams Act, there is a need for flexibility in fashioning a definition of a tender offer."

*Epstein,* 50 F.3d at 654 (citation omitted). The Court found no support in the administrative history for the defendants' timing argument and expressed concern that if "adopted, it would drain Rule 14d–10 of all its force." *Id.* at 655.

The Court then shifted the framework of the best price inquiry from timing to content. "An inquiry more in keeping with the language and purposes of Rule 14d–10 focuses not on when Wasserman was paid, but on whether the Wasserman transaction was an integral part of Matsushita's tender offer." *Id.* The Court reasoned this interpretation would best effectuate and prevent circumvention of Rule 14d–10's "equality requirements, which 'expressly preclude bidders from discriminating among holders of the class of securities that is the subject of the offer, either by exclusion from the offer or by payment of different consideration.'" *Id.,* quoting SEC Release No. 34–23421, 1986 SEC LEXIS 1179 at *10 (July 11, 1986).

Essentially, the Court held in *Epstein* that "Rule 14d–10 does not prohibit transactions entered into or effected before, or after, a tender offer—provided that all material terms of the transaction stand independent of the tender offer." *Id.* at 656.

If an ostensibly private agreement that pays a particular shareholder a sum

greater than the tender price is deemed a part of the tender offer, the tender offer does not end, by definition, until that agreement is performed. Performance of the agreement, including payment of the shareholder, will therefore take place 'during the tender offer' in violation of Rule 14d–10(a)(2).

*Id.* at n. 19.

Regarding the second MCA Insider, Sheinberg, the court concluded that a question of fact precluded summary judgment. The question concerned whether the $21 million payment was a disguised per-share premium if the tender offer succeeded or was designed to cash out stock options given to him by MCA because of his performance as COO and as compensation for agreeing to amend his employment contract with MCA. *See id.* at 658–9.

Some lower courts have followed *Epstein*'s interpretation of Rule 14d–10 in unpublished opinions. *See Maxick v. Cadence Design Sys.*, 2000 WL 33174386, 2000 U.S. Dist. Lexis 14099 (N.D.Ca. September 21, 2000); *Millionerrors Investment Club v. General Electric Co.*, 2000 WL 1288333 (W.D.Pa. March 21, 2000); *Padilla v. Medpartners Inc.*, 1998 U.S. Dist. Lexis 22839 (C.D.Ca. July 27, 1998); *Perera v. Chiron Corp.*, 1996 WL 251936 (N.D.Ca. May 8, 1996); *but see Kahn v. Virginia Retirement Sys.*, 783 F.Supp. 266 (E.D.Va.1992), *aff'd*, 13 F.3d 110 (4th Cir. 1993) (holding that "for Plaintiffs to assert any Rule 14d–10 claim, they must allege and prove that a tender offer commenced for purposes of Section 14(d)(7) and Rule 14d–10 prior to the occurrence of the purchases of which they complain.").

The court finds that the instant case is factually distinguishable from *Epstein.* Not only were the transactions at issue in *Epstein* more closely related to the tender of shares pursuant to a tender offer but the tender offer was the only event involved. Because there was no follow-up merger in *Epstein,* the Court's decision that the transactions at issue were pursuant to the tender offer flows from the fact that there was only one event with which these transactions could be associated. The Ninth Circuit recognized this distinction in a footnote, where it distinguished that case from *Kramer v. Time Warner Inc.,* because *Kramer* involved application of the best price provision of The Williams Act to an acquisition involving both a tender offer and subsequent merger under state law while *Epstein* involved only a tender offer. *Epstein,* 50 F.3d at 659 n. 21.

Moreover, the court is not persuaded by the Ninth Circuit's broad holding, which requires a subjective analysis of transactions occurring outside the tender offer period to determine if they should be deemed "integral" to the tender offer. Accordingly, the court finds that the reasoning in *Epstein* is limited to its facts and will not apply it to the payment of retention and transition awards herein promised pursuant to a merger agreement executed prior to the commencement of the Tender Offer and paid following the expiration of the tender offer and subsequent merger.

Plaintiff also relies on the United States Court of Appeals for the Second Circuit's decision in *Field v. Trump,* 850 F.2d 938 (2d Cir.1988), for the proposition that a functional fact-intensive test must be used in determining the parameters of the tender offer period for purposes of applying § 14(d)(7) and Rule 14d–10. The Court held in *Field:*

> The Williams Act does not define "tender offer." Courts faced with the ques-

tion of whether purchases of a corporation's shares are privately negotiated or are part of a tender offer have applied a functional test that scrutinizes such purchases in the context of various salient characteristics of tender offers and the purposes of the Williams Act.... Whether the acquisition of shares in a corporation is part of a tender offer for purposes of the Act cannot be determined by rubber-stamping the label used by the acquirer.  •

*Id.* at 943–44 (citations omitted). However, *Field* is factually distinguishable from the case at bar.

In *Field,* the plaintiffs sued under The Williams Act concerning a transaction that occurred in the middle of a tender offer. Shortly after the tender offer began, it was announced withdrawn by the offeror. The next day a sweetheart deal was struck between the offeror and a large shareholder. On the day after that, the offeror announced the commencement of a "new" tender offer which was on the same terms as the initial tender offer. The Second Circuit held that second offering could "constitute a continuation of the original tender offer" but an issue of fact existed as to whether there was one or two tender offers. *Field,* 850 F.2d at 944.

Plaintiff's reliance on the analysis in *Field* is misplaced. *Field* involved a transaction in the middle of the tender offer. This situation is markedly different from the facts herein where there was a completed tender offer and a subsequent merger, at which time previously promised retention and transition awards became due. Thus *Field*'s broad language purporting to define tender offer for purposes of The Williams Act is limited to cases involving interrupted tender offers. Accordingly, the court will not rely on *Ep-*

*stein* or *Field* given their factual dissimilarity to the instant case. Instead, the court finds the reasoning in the decisions relied on by Defendants persuasive and applicable to the case herein.

In support of Defendants' position that only transactions which vary the per-share price inside the tender offer period violate § 14(d)(7) and Rule 14d–10(a)(2), Defendants cite *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47 (2d Cir.1985), for the proposition that transactions immediately before or after a tender offer are not considered part of the tender offer for purposes of applying § 14(d) of The Williams Act. In *Hanson Trust,* the offeror made five privately negotiated purchases and one open market purchase for twenty-five percent of the target company's outstanding stock on the heels of the withdrawal of a publicly announced tender offer. The Second Circuit held that the open market purchases did not constitute a tender offer (or part of a tender offer) in violation of The Williams Act notwithstanding termination of the tender offer a short time before the private purchases. *Hanson Trust,* 774 F.2d at 57. The Court rejected the argument that the private purchases following the termination of a tender offer amounted to a *de facto* continuation of the tender offer "designed to avoid the strictures of § 14(d) of The Williams Act." *Id.* at 54. The holding in *Hanson Trust* illustrates the principle that transactions near in time to the tender offer but outside it are a permissible feature in mergers and acquisitions that do not constitute a tender offer or continuation thereof under section 14(d) of The Williams Act.

The United States Court of Appeals for the Seventh Circuit extended the reasoning in *Hanson Trust* to a situation similar

to the transaction herein in *Lerro v. Quaker Oats*, 84 F.3d 239, 240 (7th Cir.1996), the primary case on which Defendants base their motion to dismiss. In *Lerro*, stockholders challenged as a violation of § 14(d)(7) and Rule 14d–10 certain benefits granted to Thomas Lee, a controlling shareholder, in a Distribution Agreement executed prior to the commencement of the tender offer. Under the terms of the Distribution Agreement, Lee received certain exclusive distribution rights which would accrue upon successful consummation of the tender offer. *See Lerro*, 84 F.3d at 240. "The Distribution Agreement was signed on November 1, but its effect depended on the merger ...." *Id.* at 244. The Merger Agreement, which required Lee to disclose his support of the merger to the shareholders in addition to promising to tender his own shares, was also signed November 1, 1994. The tender offer commenced on November 4, 1994. A short-form merger under Delaware law took place after the tender offer was concluded. *See id.* at 240.

The *Lerro* plaintiffs contended that the distribution rights constituted additional consideration for Lee's shares, in violation of § 14(d)(7) and Rule 14d–10(a)(2). They argued that the Distribution Agreement was "integral to the transaction" linking the agreement for distribution rights to Lee's endorsement of the tender offer. *Id.* at 244.

The Seventh Circuit affirmed the district court's order dismissing the case for failure to state a claim. The Court held that the provisions of Rule 14d–2(a), defining when a tender offer begins, set a temporal limit defining the phrase "during the tender offer". *Id.* at 245. Transactions or agreements made before the commencement of the Tender Offer do not, by definition, occur "during the Tender Offer."

Before the offer is not 'during' the offer. Many cases ... tell us to respect the language of the securities statutes and regulations. The difference between 'during' and 'before' (or 'after') is not just linguistic. It is essential to permit everyone to participate in the markets near the time of a tender offer.... Treating the Williams Act as a mandate for an identical price across the board 'as opposed to an identical price for all shares acquired in the offer' would make all investors worse off.

*Id.* at 243 (citations omitted). Therefore, under *Lerro*'s bright-line test, the protections in § 14(d)(7) and Rule 14d–10 only apply to transactions between the commencement and expiration of the actual tender offer period.

Admitting that the viability of the Distribution Agreement depended on the merger and was "bound up" in the tender offer, the Court found that the relationship between the tender offer and the Distribution Agreement "did not establish that Quaker Oats paid Lee more than $14 per share 'during' the tender offer." *Id.* at 244. The Court held that the inquiry whether or not the challenged consideration was integral to the tender offer was irrelevant for purposes of Rule 14d–10. It continued, "our case is about 'when' rather than 'what'" and thus made timing the central inquiry in its examination of whether Rule 14d–10 had been violated. *Id.* "The agreements were signed before the offer began, and were effective with a merger that occurred later.... They are different transactions, under different bodies of law (federal law regulates the tender offer and state law the merger)." *Id.* As such, consideration paid pursuant to the distribution agreement did not occur during the tender offer and was not subject to

Rule 14d–10(a)(2). As support for this proposition, the Court cited *Hanson Trust*, as demonstrating that transactions prior to the commencement of a tender offer or after its termination are permissible and "do not establish a floor under the price to be paid for shares tendered into the offer." *Id.* at 243.

> [T]he point of Rules 10b–13, 14d–10, and their cousins is to demark clearly the periods during which the special Williams Act rules apply. Once the offer begins, professional investors and amateurs receive the same price. That is the objective of § 14(d)(7) and Rule 14d–10. Persons who make tender offers do not lose their ability to participate as investors for undefined periods "near" the time of the offer.

*Id.*

Thus, the Seventh Circuit interpreted Rule 14d–10 as governing transactions only *during* the tender offer period. In determining whether transactions precede the tender offer, the Court held that Rule 14d–2 addressed the inquiry directly, as that regulation prescribes when a tender offer commences for the purposes of section 14(d) of the Act.

The court finds the reasoning in *Lerro* persuasive and applicable to the matter at hand. Unlike *Epstein*, *Lerro* involved both a tender offer and a short-form merger governed by state law just as in the instant matter. Further, the plaintiffs in *Lerro* were challenging alleged additional consideration pursuant to an agreement executed prior to the commencement of the tender offer that did not vary the per-share tender price offered to the investor during the tender offer period. Similarly, here Plaintiff challenges consideration originating from a clause in the Merger Agreement honoring retention and transition awards agreed upon prior to the commencement of the Tender Offer and that did not vary the per-share price offered to any shareholders during the tender offer period.

Also, the court finds persuasive the Seventh Circuit's discussion of Rule 14d–2's applicability as a benchmark for defining "during the tender offer" in Rule 14d–10 and § 14(d)(7). It is logical to import Rule 14d–2's temporal parameters given its stated direct application to "section 14(d) of the Act." 17 C.F.R. § 240.14d–2(a).

In addition, the Seventh Circuit addressed the precise argument asserted by Plaintiff herein that the tender offer and subsequent merger should be treated as one integrated transaction for purposes of applying § 14(d)(7) of The Williams Act and Rule 14d–10. In *Lerro*, the Court rejected such an argument and held that a "follow-up" merger under state law cannot be integrated with the tender offer into a single step as they are different transactions governed by different bodies of law. *Lerro*, 84 F.3d at 244.

> Accepting plaintiffs' request to treat the tender offer and the merger as a single step would imperil countless ordinary transactions—from two-tier tender offer and merger sequences (with different prices, or different forms of securities, offered in the two tiers) to simple employment agreements under which the surviving entity promises to employ managers for stated terms or give severance pay. Suppose a firm's CEO, who is also a shareholder, negotiates a deal under which his contract will be extended for two years after an acquisition. Must a court attempt to determine how much in advance of two years the CEO would have been eased out, but for the agree-

ment? On plaintiffs' view the difference is a "premium" for the CEO's shares, payable to all other investors too. Yet none of the regulations implementing the Williams Act requires managerial salary, or Golden Parachute payments, to be imputed to stock and offered to non-managers as well.

*Id.* The Court found support for its holding that a follow-up merger should not be treated as part of the tender offer in the United States Court of Appeals for the Second Circuit's decision in *Kramer v. Time Warner Inc.*, 937 F.2d 767, 778–79 (2d Cir.1991).

The facts of *Kramer* are also close to the facts in the instant case.[7] The transaction at issue in *Kramer* involved Time Incorporated's acquisition of Warner Communications Incorporated in a two-step statutory merger, whereby the equity was acquired in two steps: the bidder first acquired 51% of the target's common stock pursuant to a tender offer and the remaining 49% pursuant to a second-step statutory merger. Shareholders sued under § 14(d)(7) and Rule 14d–10 over certain adjustments in the resale price of equity units and stock options for top Warner executives by the target company after the expiration of the tender offer and just prior to the formal consummation of the second-step merger. *Kramer*, 937 F.2d at 771.

The plaintiffs argued that the adjustments to the Equity Plan and stock option program enabled the individual defendants to receive the equivalent of $70.00 per share in cash for their interest in Warner in the second-step statutory merger, whereas other shareholders received a Se-curities Package worth $61.75 per share. The plaintiffs maintained that such transactions were part of the tender offer and subject to the best price provisions of The Williams Act because they allowed top management to receive a higher cash price equivalent for their shares. *Id.* at 779.

The Court held that the § 14(d)(7) claims were meritless. Specifically, the Court held that the best price provision of The Williams Act did not apply to actions by the target company or to transactions after the expiration of the tender offer. *Id.* In the instant case, the court notes that Vallen was the target company prior to the merger but subsequently became the surviving entity. As such, the target company herein both promised the retention and transition awards prior to the Tender Offer's commencement and actually paid the retention and transition bonuses after the merger following the expiration of the Tender Offer making The Williams Act inapplicable under the rubric of *Kramer*.

More persuasive, however, is *Kramer*'s holding that a second-step statutory merger, following a successful tender offer for 51% of the target's shares, does not constitute a continuation of the tender offer for purposes of applying § 14(d)(7). *Id.* The Court held:

Such a merger lacks the most salient characteristics of a tender offer—an offer to purchase, tender and acceptance. Moreover, state and federal law clearly treat mergers as distinct from tender offers. Statutory mergers are authorized and regulated by state corporation codes, and federal regulation of such mergers is found in federal regulations

---

7. In *Epstein,* the Ninth Circuit distinguished *Kramer* from the facts of that case because *Epstein* only involved a tender offer and no subsequent statutory merger. The instant case is distinguishable from *Epstein* and analogous to *Kramer* for the same reason, as it involves both a tender offer and subsequent merger under state law.

concerning the solicitation of proxies. Finally, the Williams Act contains, in addition to the 'best price' provision, time limits, disclosure requirements, pro rata acceptance rules, and provisions for withdrawal of tendered shares that make no sense whatsoever in the merger context. The claim that the Williams Act applies to second-step statutory mergers is thus meritless.

*Id.* (citations omitted). While this court recognizes that the structure of the transaction in *Kramer* is different from the instant case in that it involved a two-step acquisition[8], the facts are analogous enough for such reasoning to be applicable. Thus under *Kramer*, payment of retention and transition awards pursuant to a merger governed by Texas law after the expiration of the tender offer cannot be considered a continuation of the tender offer, and the claim that such additional consideration violates The Williams Act is without merit.

Therefore the court rejects Plaintiff's argument that the Tender Offer and merger "were interdependent and constituted one integrated transaction" and should be treated as an integrated transaction under the reasoning of *Kramer* and *Lerro*. Although the Tender Offer and the merger were connected in the instant matter, they were in fact separate transactions. This is evidenced by the descriptions of each transaction, both with their own set of conditions, in the SEC documents. The "Offer" and "Merger" are described in separate Articles in the Merger Agreement. The SEC documents and the Merger Agreement expressly state that the

Texas Business Corporation Act ("TBCA") would govern the merger, and there are many references in the SEC documents to the TBCA with respect to the merger. [Schedule 14D–1, Ex. 99.A.1 at 1; Ex. 99C.1 at 5]. In contrast, federal securities law governed the Tender Offer. [Schedule 14D–1, Ex. 99C.1 at 2–5].

■ Applying the foregoing to the facts herein, Plaintiff must allege and prove at a minimum four elements in order to establish a violation of § 14(d)(7) and Rule 14d–10: (1) that the bidder, (2) during the pendency of the bidder's tender offer, (3) purchased a security that is the subject of the tender offer, (4) for more consideration than the bidder paid to other shareholders pursuant to the tender offer. *See Kahn v. Virginia Retirement Sys.*, 783 F.Supp. 266 (E.D.Va.1992), *aff'd*, 13 F.3d 110 (4th Cir. 1993). In determining the temporal parameters of the tender offer for purposes of The Williams Act, the court agrees with the Seventh Circuit that the SEC Rule 14d–2 sets forth when a tender offer commences for purposes of The Williams Act. *See* 17 C.F.R. § 240.14d–2(a).

■ Plaintiff's claims fail on the second element—during the pendency of the tender offer. The promise to pay the retention and transition awards was made by the target company, conditioned only on a change of control. The Merger Agreement, honoring the payment of the retention and transition awards, previously promised by Vallen, was signed on November 14, 1999, to become effective after the successful close of the Tender Offer and merger. There is no dispute that the Ten-

---

8. A two-step acquisition occurs when the bidder acquires a controlling interest in a target and subsequently acquires the balance of equity securities in the merger. In *Kramer,* the bidder first acquired 51% of the target's common stock pursuant to the tender offer and the remaining 49% pursuant to a second-step statutory merger.

der Offer commenced on November 19, 1999, and closed on December 17, 1999.[9] There are no allegations in the complaint that Hagemeyer varied the tender price of $25.00 per share between November 19, 1999 and December 17, 1999. Payment of the retention and transition awards by Vallen, as the surviving entity, was due on consummation of the merger.

Thus the promise to pay and actual payment of the retention and transition awards were both outside the tender offer period. As such, both fall outside of the scope of § 14(d)(7) and Rule 14(d)–10 because the terms of the Tender Offer were not varied with respect to the Vallen Insiders during the pendency of tender offer. Accordingly, Plaintiff cannot state a claim as a matter of law under § 14(d)(7) and Rule 14d–10(a)(2).

As further support for the holding herein, the court cites the plain language of § 14(d)(7) and Rule 14d–10, their respective administrative and legislative histories, and policy. Under a plain language reading of § 14(d)(7), the conduct at which the statute is aimed involves "vari[ance of] the terms of a tender offer . . . before the expiration thereof." 15 U.S.C. § 78n(d)(7). Thus a reading of the plain language embraces only variation in the per-share price offered by the bidder before the end of the tender offer.

Moreover, Rule 14d–10(a)(2) limits the tender offeror such that "[t]he consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer." 17 C.F.R. § 240.14d–10(a)(2). On its face, the Rule is aimed at conduct during the pendency of the tender offer.

This interpretation can be reconciled with the legislative and administrative history. Although nothing in the history of either § 14(d)(7) or Rule 14d–10 directly addresses the instant controversy, both parties cite portions of the legislative and administrative history which emphasize equal treatment of tendering security holders.

> [S]ection 14(d)(7) assures equality of treatment among all security holders who tender their shares by requiring that any increase in consideration offered to security holders be paid to all security holders whose shares are taken up during the offer. One of Congress' purposes in promulgating the provisions was "to assure equality of treatment among all shareholders who tender their shares." These substantive provisions assume that offers will be made to all security holders and not just to a select few, and that offers will not be made to security holders at varying prices. Without the all-holders requirement and best-price provision [in Rule 14d–10], the specific protections provided by sections 14(d)(6) and (d)(7) would be vitiated because an offeror could simply address its offer either to a privileged group of security holders who hold the

---

**9.** There was a public announcement on November 15, 1999 that Hagemeyer would purchase Vallen for $25.00 per share in a tender offer. Nonetheless, Plaintiff did not dispute Defendants' assertions that the Tender Offer commenced on November 19, 1999. Moreover, in the Complaint, Plaintiff stated the Tender Offer was "accomplished" on November 19, 1999, through the Offer to Purchase issued by Hagemeyer, which was attached to the Solicitation Statement filed by Vallen and the Schedule 14D–1 Tender Offer Statement, filed with the SEC on the same day. [Complaint ¶ 19]. Plaintiff further averred the Tender Offer was conducted between November 20, 1999, and December 17, 1999. [*Id.*]

desired number of shares or to all security holders but for different considerations.

SEC Release Nos. 33–6653, 34–23421, 51 Red. Reg. 25873, *25876 (July 17, 1986).

This court has found no language in the administrative or legislative history supporting the expansive reading of § 14(d)(7) and Rule 14d–10 proposed by Plaintiff. In contrast, certain passages indicate a more precise application of the protections provided by the laws, restraining their application to the tender offer period.

For example, one portion of the legislative history reads:

> Proposed section 14(d)(7) would provide that where a person making a tender offer increases the consideration offered to shareholders *before the expiration of the tender offer,* he must pay the increased consideration to those who tendered their securities prior to the increase in the price, whether or not he had taken up any of the securities before the increase in consideration was announced. *The purpose of this provision is to assure fair treatment of those persons who tender their shares at the beginning of the tender period, and to assure equality of treatment among all shareholders who tender their shares.*

H.R.Rep. No. 90–1711 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2811 (emphasis added). This passage indicates Congressional intent that § 14(d)(7), as proposed, would apply to transactions confined within the tender period. It also specifically addresses increases in the tender price "before the expiration of the tender period," referencing a temporal frame defined by the tender offer period. Further, the court finds persuasive the language indicating the statute's protection was directed at share-

holders, who tendered their shares at the beginning of the tender period, from increases in the per-share price later in the tender period. *See id.*

Similarly, a SEC Release seeking comments on the proposed Rule 14d–10 provided the following:

> 2. Best Price Rule. Paragraph (a)(2) of the proposal would require that the consideration paid to any security holder pursuant to the tender offer be the highest consideration offered to any security holder at any time during such tender offer. If more than one type of consideration is offered pursuant to the tender offer, the types of consideration must be substantially equivalent in value. *The date for making the initial determination as to substantial equivalence in value is the earlier of the date of public announcement as specified in Rule 14d–2(b), or the date of commencement as defined in Rule 14d–2(a).* If the bidder increases the consideration offered, an additional determination as to substantial equivalence would be required as of the date the increased consideration is first offered to security holders. The consideration that a bidder ultimately must pay a tendering shareholder, however, must be the highest consideration offered of that type. *By requiring that a bidder pay the highest consideration offered, this rule would have the effect of codifying the Commission's position that a bidder may not lower the offering price without commencing a new tender offer.* Under the current tender offer rules, the staff takes the position that a decrease in the consideration offered to security holders constitutes a new tender requiring the return of tendered shares and the beginning of new time periods.

SEC Release Nos. 33–6595; 34–22198, 50 Fed.Reg. 27976, *27978–9, (July 9, 1985) (emphasis added).[10] This passage supports the court's determination that § 14(d)(7) and Rule 14d–10 are aimed at conduct during the pendency of the tender offer. First, it incorporates Rule 14d–2's timing provisions as governing when to make the relevant comparison: "The date for making the initial determination as to substantial equivalence in value is the earlier of the date of public announcement as specified in Rule 14d–2(b), or the date of commencement as defined in Rule 14d–2(a)." *Id.* Second, it indicates the purpose of the Rule was to prevent a decrease in the share price by the bidder during the tender offer period, focusing again on the time during the pendency of the tender offer. *See id.*

Lastly, a narrow reading of these provisions supports a strong policy argument of providing clarity and finality for mergers and acquisitions. In connection with the amendments to the best price provisions in the 1980s, including the adoption of Rule 14d–10, the SEC recognized "a need to provide clarity and certainty in the regulatory scheme applicable to tender offers with respect to equal treatment of security holders." [Def. Reply Brief at 5, citing SEC Release Nos. 33–6653, 34–23421, 51 Fed.Reg. 25873, *25881 (July 17, 1986)]. Defendants maintain, and this court agrees, that no clarity or certainty will follow "if the applicability of the statute and rules is controlled by an inherently subjective analysis.... Such a construction makes every tender offer the certain object of, and easy prey for, protracted and expensive litigation." [*See id*].

The court agrees with Judge Easterbrook's expressed concern over "treating private negotiations as the 'commencement' of a tender offer." *Lerro,* 84 F.3d at 246. Such an interpretation of § 14(d)(7) and Rule 14d–10 would hinder the type of bargaining that accompanies successful mergers and acquisitions.

It would defeat the purposes of the Williams Act and the SEC's regulations to close the proration pool before the public learns of the offer. It would wreak havoc to say that the operation of all of the clocks cannot be known until, years after the events, a judge declares when negotiations became sufficiently serious to mark the commencement of the offer. Everything depends on making the times start from a public announcement—and on making that time as clear as humanly possible. That is the function of Rule 14d–2.

*Id.*

Conversely, Plaintiff argues that policy demands the statutory and regulatory language be interpreted more broadly so that it is consistent with the over-arching policy of providing equal treatment to shareholders in connection with a tender offer. Plaintiff argues that Defendants' interpretation vitiates the protections afforded by the statute, namely that "offers will be made to all security holders and not just a select few, and that offers will not be made to security holders at varying prices." [Pl. Brief in Response to Def. Motion to Dismiss at 23–24, quoting SEC Release No. 34–23421, 1986 SEC LEXIS 1179 at *15 (July 11, 1986)]. Plaintiff maintains that "neither the legislative nor administrative history suggests that tender offerors may contract around § 14(d)(7) and Rule 14d–

---

**10.** Incidentally, the Rule was adopted as proposed a year later following the request for comments sought in this SEC Release. *See*

SEC Release Nos. 33–6653, 34–23421, 51 Fed.Reg. 25873, *25878 (July 17, 1986).

10 by manipulating the timing of the payments." [Pl. Brief in Response to Def. Motion to Dismiss at 3]. By adopting Defendants' timing argument, Plaintiff contends that bidders can easily circumvent the statute's proscriptions.

However, the undersigned finds that the countervailing policy arguments here are stronger given the plain language of the statute. To treat the Tender Offer and subsequent merger as one integrated transaction would encourage litigation and court intervention over every agreement executed concomitantly with a merger and acquisition, particularly those which provide compensation to key employees in the event of a take-over. In a business setting, it is impracticable to leave the validity of such agreements and the legality of ensuing tender offers subject to endless litigation.

Accordingly, the court GRANTS Defendants' motion to dismiss [# 5] as no set of facts supports Plaintiff's claims as a matter of law. Plaintiff's motion for appointment of lead plaintiff and lead counsel [# 9] is DISMISSED AS MOOT.