Lowell KATT, On Behalf of Himself and All Others Similarly Situated, Plaintiffs,

v.

TITAN ACQUISITIONS, INC.; United Technologies Corporation; William Trachsel, Ari Bousbib, Angelo Messina, Gilles Renaud, and David Fitzpatrick Defendants.

No. 99–CV–655.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 10, 2003.

Stanley M. Chernau, Linda F. Burnsed, Chernau, Chaffin & Burnsed, PLLC, Nashville, TN, George Edward Barrett, Barrett, Johnston & Parsley, Nashville, TN, Steven E. Cauley, Cauley, Geller, Bowman & Coates, LLP, Little Rock, AR, Darren J. Robbins, Mark Solomon, Randall J. Baron, William S. Learch, Douglas R. Britton, Rajesh A. Mandlekar, David A. Thorpe, Shawn M. Hays, Patrick J. Coughlin, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Deigo, CA, Roger Mark Adelman, Washington, DC, for plaintiffs.

Ames Davis, Mark H. Wildasin, Nancy S. Jones, Waller, Lansden, Dortch & Davis, Nashville, TN, Richard V. Conza, Richard F. Ziegler, David E. Brodsky, Justin S. Anand, Cleary, Gottlieb, Steen & Hamilton, New York City, David M. Meisels, Herrick, Feinstein LLP, Newark, NJ, for defendants.

## MEMORANDUM

ECHOLS, District Judge.

Presently pending before the Court are the following motions: (1) Defendants' Motion for Summary Judgment (Docket Entry No. 88); (2) Plaintiff's Motion for Additional Discovery in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket Entry No. 114); (3) Plaintiff's Motion to Strike (Docket Entry No. 111); and (4) Plaintiff's Motion for Sanctions for Spoliation of Electronic Evidence (Docket Entry No. 105). All motions are opposed except Plaintiff's Motion to Strike.

## I. *PROCEDURAL HISTORY*

This lawsuit began on July 27, 1999, when Plaintiff Lowell Katt, an investor, filed this class action on behalf of himself and similarly situated investors against Defendants Titan Acquisition Ltd. ("Titan"); United Technologies Corporation ("UTC"); William Trachsel, a UTC officer; and Ari Bousbib, Titan's president (collectively, "Defendants"). The initial Complaint (the "Complaint") alleged that UTC was directly involved in the adoption of change in control agreements, familiarly known as "golden parachutes," by International Comfort Products ("ICP") on March 15, 1999, over three months before UTC announced its tender offer for ICP's stock, and that this involvement violated Section 14(d)(7) of the 1968 Williams Act Amendments (the "Williams Act") to the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(d)(7), and Rule 14d–10 promulgated thereunder, 17 C.F.R. § 240.14d–10 (commonly referred to together as the "Best Price Rule").

Plaintiff's theory, as expressed in the Complaint, was that UTC insisted on or at least was intimately involved in implementing the golden parachutes between ICP and some of its top executives as a form of additional consideration—in essence, a bribe, or as the Plaintiff puts it, "camouflage"—to ICP's executives to induce them to tender their own shares and to sell ICP's stock at an artificially low price.[1] (Docket Entry No. 1, at ¶ 30). Plaintiff also alleged that the transition services agreements between UTC and ICP executives, pursuant to which ICP's departing executives received retention bonuses if they remained with the company during a transition period of three months after completion of the acquisition, violated the Best Price Rule.

The Court referred the management of the case to then-Magistrate Judge Haynes. On September 21, 1999, Defendants moved to dismiss the Complaint. (Docket Entry No. 8). Before the Court rendered judgment on Defendants' motion, Judge Haynes was appointed to the District Court. Upon Judge Haynes' appointment, the Court referred management of the case to Magistrate Judge Brown and, pursuant to the division of the docket upon judicial appointment, reassigned the case to newly-appointed Judge Haynes.

In response to Defendants' Motion to Dismiss, Plaintiff asserted that dismissal was inappropriate because the golden parachutes executed March 15, 1999, and transition services agreements were simply "an elaborate camouflage used to conceal the payments to ICP's top executives in exchange for tendering shares and/or endorsing the tender offer ...." (Pl.'s Mem. in Supp. of Opp. to Defs.' Mot. to Dismiss, Docket Entry No. 17, at 8). Plaintiff alleged that the agreements were executed at UTC's insistence, in order to ensure that UTC would acquire ICP by way of the tender offer.

On November 17, 2000, Judge Haynes denied Defendants' Motion to Dismiss, expressly relying in part on Plaintiff's allega-

---

1. Specifically, Plaintiff alleged the following: On March 15, 1999, the ICP Insiders agreed with defendants that they would be willing to sell ICP to Titan for an exceptionally low price of less than $12 per share, if defendants would agree to pay lucrative benefits to the ICP Insiders as part of Titan's planned Tender Offer for ICP shares. Four days later, on March 19, 1999, Titan and the ICP Insiders signed a confidentiality agreement so that the ICP Insiders could complete the sale of ICP to Titan. Contemporaneously with ICP's negotiations with Titan, ICP (with the understanding and approval of Titan) entered into agreements with the ICP Insiders which expressly provided for the acceleration of incentive awards and performance unit awards as well as "change of control" bonuses. *Id.* at ¶ 21.

tion that UTC was directly involved in ICP's creation of the golden parachutes for its executives. (*See* Docket Entry No. 29, at 21–21) (stating, "[t]he Court agrees that as a general rule, incentive contracts between a company and its key officers and executives are not subject to Section 14(d)(7), but these agreements ... could be found to have been induced by Titan as part of its tender offer for ICP and not as contracts between ICP and its officers").

Plaintiff moved for class action certification on December 15, 2000. Judge Haynes granted the motion and certified this case as a class action on April 19, 2000. Judge Haynes' involvement in the case ended when he recused himself on December 17, 2001, and the case was reassigned to this Court.

On May 13, 2002, Plaintiff amended the Complaint to add Angelo Messina, Gilles Renaud, and David Fitzpatrick as Defendants and to "conform [the Amended Complaint] to the evidence." (*See* Amended Complaint, Docket Entry No. 78). Specifically, Plaintiff abandoned his initial theory, expressed in the Complaint and reiterated in his opposition to Defendants' argument for dismissal, that UTC was directly involved in ICP's adoption of the March 15, 1999, golden parachutes. *Id.* at ¶ 40 (alleging that UTC was "confronted with" the agreements in May or June 1999, during due diligence after making the tender offer, and that UTC considered them to be a "major find" of due diligence). The Amended Complaint alleges that Defendants violated the Best Price Rule because they "expressly agree[d] to honor [the golden parachutes] as drafted." *Id.* Thus, in essence, Plaintiff has amended his theory that Defendants violated the Best Price Rule by their alleged involvement with or even insistence upon the golden parachutes to allege instead that Defendants are liable because they honored the agreements as an inducement to the ICP top executives to tender their shares and promote the acquisition.

On October 2, 2002, Defendants moved for summary judgment. That Motion is presently before the Court. In addition, Plaintiff moved the Court on October 29, 2002, to sanction Defendants for spoliation of electronic evidence. On November 1, 2002, Plaintiff moved to strike certain testimony and evidence and also to allow additional discovery in support of his opposition to Defendants' Motion for Summary Judgment.

## II. *SUMMARY JUDGMENT STANDARD*

In ruling on a motion for summary judgment, the Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 258, 106 S.Ct. 2505 (citing Fed.R.Civ.P. 56(c)). The moving party bears the burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact which is disputed. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If so, summary judgment dismissal is inappropriate.

To defeat a properly supported motion for summary judgment, an adverse party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.

R.Civ.P. 56(e). The non-moving party's burden of providing specific facts demonstrating that there remains a genuine issue for trial is triggered once the moving party "show[s]—that is, point[s] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III. *RELEVANT FACTS*

Viewing them in the light most favorable to the Plaintiff, as the Court must do, the facts from which this case arises are as follows:

#### A. *Background to the ICP Sale*

ICP is a Canadian corporation based in Franklin, Tennessee. It manufactures heating, ventilation, and air conditioning ("HVAC") systems for home and commercial use. ICP was a publicly traded company before its acquisition by and merger into UTC in 1999. ICP now is a wholly-owned subsidiary of another UTC subsidiary, Carrier, which is the market leader in the HVAC industry.

ICP suffered significant losses in the early and mid 1990's. In an effort to revitalize the company, ICP's Board of Directors began hiring a new management team in September 1994. ICP hired Michael Clevy as Chief Operating Officer and then promoted him to Chief Executive Officer in January 1996. Once the new management team was installed, ICP's Board adopted an executive compensation and incentive strategy in 1997 that was performance-based and intended to be competitive with plans offered by similar companies. Under this strategy, ICP provided change in control employment agreements to nine executives between 1994 and 1997. The agreements guaranteed between 12 and 24 months of salary and benefits in the event of a change in control. In late 1997 and 1998, the Board considered enhancing the change in control agreements but elected to leave them unrevised.

By late 1998, ICP had returned to profitability. In late 1998 and early 1999, ICP's two largest shareholders, Richard Synder, who controlled 20.36 percent of ICP's outstanding stock through a family partnership, Ravine Partners, Ltd. ("Ravine Partners"), and the Ontario Teachers Pension Fund ("Ontario"), which owned 19.4 percent of ICP's stock, raised the possibility of selling some or all of their stock. Ravine was represented on ICP's Board by Snyder, who served as the Chairman, and Ontario was represented on the Board by one of its officials, Roy Graydon.

When Clevy and other ICP executives learned that the company's two largest institutional shareholders were considering selling their stock, Clevy informed the Board that members of senior management might be interested in acquiring the company through a leveraged buy out ("LBO").

ICP's Board met on January 20, 1999, to consider its options and decided to sell the company. The twelve-member Board included only one ICP executive, Clevy. The other eleven directors were independent. Shortly thereafter, the Board interviewed three financial advisors: Donaldson, Lufkin & Jenrette, Lehman Brothers, and Credit Suisse First Boston ("CSFB"), all of which recommended a strategic sale of the company in a structured and competitive auction. The company retained CSFB on February 3, 1999. The Board approved an auction process under the control of a "Special Committee" and authorized CSFB to solicit bids from potential buyers. Clevy advised CSFB that the most likely bidders for ICP were large companies in the HVAC industry, among which UTC's subsidiary, Carrier, was the

leader. CSFB concurred and contacted UTC on March 2, 1999, the day it began soliciting bids for ICP.

During March, CSFB contacted over 40 potential bidders. Twenty were sufficiently interested to execute confidentiality agreements with CSFB, which then provided each with confidential information about ICP. UTC was among these potential bidders, signing a confidentiality agreement with ICP and CSFB on March 25, 1999. Because ICP's management also were among the potential bidders, they were excluded from the sale process, the management of which was left to CSFB and the Special Committee of ICP's Board.

### B. *The ICP Golden Parachutes*

At the same time that CSFB was negotiating with potential bidders, UTC among them, the Compensation and Pension Committee of ICP's Board began to review the company's existing change in control agreements, with an eye to revising and augmenting them. On March 9, 1999, after consulting with ICP's outside counsel and in-house counsel and personnel specialists, the Committee and the full Board approved golden parachutes for ICP's executive management team that provided additional benefits to all eleven of its senior managers. The agreements, which were executed on March 15, extended each executive's severance period by one year, added a bonus component to the salary calculation, extended benefits for an additional year, and accelerated unvested stock options. Plaintiff alleges that these 1999 golden parachutes provided roughly $11 million in additional benefits in comparison to the existing executive compensation agreements.

According to Defendants, the revised golden parachutes that ICP's Board approved were necessary to ensure that the company remain competitive with other players in the HVAC industry and were adopted at the prompting of ICP executives and after research finding that the existing change in control agreements "were incomplete, inconsistent as applied to the entire group, and provided insufficient benefits." (*See* Defs.' Mem. in Supp. of Mot. for Summ. J., Docket Entry No. 102, at 12–13). Further, according to Defendants, "[t]he ICP Board members believed it important to approve the Agreements to retain key managers in place during the sales process and keep them focused on their work without being distracted by concerns of job security." *Id.* at 14. Defendants also allege that the Board was motivated to extend the new benefits in part because it was concerned about management flight before ICP could consummate a sale to the winning bidder.

Plaintiff, on the other hand, denies Defendants' explanation for the golden parachutes, alleging that it is a pretext and that the agreements "were approved simply to secure additional consideration for ICP's executives from ICP's acquiror." (*See* Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J., Docket Entry No. 109, at 16). In support of his theory, Plaintiff alleges that no references to concerns about management flight appear in the minutes of the Board meetings in which the 1999 golden parachutes were approved. Therefore, according to Plaintiff, these agreements served no proper purpose and were "illegitimate." *Id.* Plaintiff argues that because ICP's Board passed on revising the executive compensation agreements in 1998, when it found them adequate, there was no legitimate reason to amend and expand after the ICP auction had commenced in 1999.

### C. *UTC/Titan's Acquisition of ICP*

At the end of March 1999, CSFB requested non-binding indications of interest, including preliminary bids, from potential

buyers. Five bidders, including UTC, responded by the deadline of April 28, 1999. One of the other four was Centicorp Venture Capital, on behalf of managements' LBO bid. UTC's preliminary bid of $10–12 per share was the highest of the five submitted. ICP's Special Committee rejected the two lowest bids and then allowed the remaining three potential bidders to review its files extensively during a due diligence period that lasted from May to early June 1999.

Although Plaintiff alleged in his original Complaint that UTC was aware of ICP's golden parachutes from the outset of the ICP Board's discussions about whether to adopt them, he now concedes in his Amended Complaint that UTC was "confronted with" the change in control agreements for the first time during due diligence of ICP in June 1999 and further asserts that UTC considered them to be a "major find." (See Docket Entry No. 78 ¶ 39). Further, Plaintiff now alleges that after "UTC uncovered the Enhanced Change of Control Agreements ... [they] obviously were a source of contention." (See Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J., Docket Entry No. 109, at 18).

Each of the three potential buyers submitted binding bids by June 16, 1999. UTC's all-cash bid of $11.25 per share was the highest by a wide margin and represented a premium over ICP's historical trading price. Nevertheless, in subsequent negotiations with all three bidders, CSFB and ICP were able to convince UTC to increase its bid to $11.75 per share, which provided a 65 percent premium over the stock's price when the sale began in January 1999 and a 37.4 percent premium over the average closing price of ICP shares for the three-month period that ended on June 23, 1999. On June 23,

ICP's Board considered the bids and, in consultation with CSFB, unanimously accepted UTC's bid.

On June 24, 1999, a little over three months after ICP's Board adopted the new golden parachutes for its executives, Defendants UTC, Titan, a wholly-owned subsidiary of UTC,[2] and ICP announced a pre-acquisition agreement, in which they outlined Titan's proposed tender offer for ICP's outstanding shares at $11.75 per share, with a total consideration of approximately $479 million. The pre-acquisition agreement specified a two-tiered transaction: first, the tender offer by Titan of $11.75 per share to all ICP shareholders, to commence one week from execution of the agreement; and second, assuming that UTC acquired at least 71 percent of ICP's stock, a second-stage or short-form merger in which UTC would acquire all the remaining ICP shares at the same share price of $11.75. Individual Defendants William Trachsel, Angelo Messina, Gilles Renaud, and David Fitzpatrick approved the transaction for UTC as members of its Acquisition Review Committee.

In the pre-acquisition agreement, UTC pledged its intention to "honour and comply with the terms of those existing executive termination and severance agreements, plans, or policies of ICP and its subsidiaries, ... to the extent disclosed in the Disclosure Schedule or ICP's SEC reports ...," which included the golden parachutes ICP executed on March 15, 1999.[3]

On the same day it reached the pre-acquisition agreement with ICP, UTC executed lock-up agreements with Snyder of Ravine Partners and with Ontario, under which the two largest ICP shareholders committed to tender their collective holdings of almost 40 percent of ICP stock at

---

**2.** UTC created Titan as an acquisition vehicle to effectuate the tender offer.

**3.** ICP had included this provision in the pre-acquisition agreements it submitted to all three final bidders.

the same $11.75 per share price that all other shareholders were to receive. At that time, ICP's management held less than one percent of the company's outstanding shares, or 3.5 percent counting unexercised stock options.

Titan initiated the tender offer on June 30, 1999, when it filed with the Securities and Exchange Commission ("SEC") its Tender Offer Statement on Schedule 14D–1 to explain the terms of the tender offer and procedure for ICP shareholders to tender their shares.

Plaintiff alleges that during the tender offer, "ICP's management set out to ensure that UTC's Tender Offer was a success." (Pl.'s Mem. in Opp. to Mot. for Summ. J., Docket Entry No. 109, at 20). Although Plaintiff seems to find this fact alone ominous, he alleges more specifically that "[i]n a meeting with an [anonymous] ICP employee and the owner of a significant block of shares a 'day or two' after the announcement [of the tender offer, but prior to its formal commencement], Clevy told the employee that he 'had no choice but to ... tender shares' because 'several large shareholders controlled a *majority* of the stock and were committed to tendering their shares,'" thus leaving the employee's shares "worthless" if not tendered. *Id.* (quoting Shareholder Affidavits, Ex. A ¶ 5). Plaintiff further alleges that ICP's CEO, Clevy, made similar statements to employee-shareholders at an ICP facility in Lewisburg, Tennessee, in July 1999. Plaintiff contends that the payments to the ICP executives under their golden parachute and transition services agreements were intended to "handsomely reward[ ] [them] for these efforts." *Id.* at 21.

By the expiration of the tender offer on August 9, 1999, ICP shareholders had tendered over 98 percent of ICP's stock in response to UTC's tender offer. Under Canadian law, this entitled UTC to acquire the approximately 1.5 percent of remaining shares in a compulsory merger. That second stage of the acquisition was completed on September 7, 1999.

## D. *The Transition Services Agreements*

UTC honored the golden parachutes that ICP had provided its management team prior to the tender offer. According to Defendants, UTC believed it was contractually obligated to honor them and never seriously considered refuting them. In addition, UTC also negotiated transition services agreements with ten of the ICP executives between July and August 1999 and paid retention bonuses to them pursuant to those agreements. Specifically, these agreements, which were executed between the individual executives and Carrier, the UTC subsidiary, which entitled the executives to bonuses between $50,000, in the case of the most junior executive, to $500,000, in Clevy's case, provided that the executive remained with Carrier for up to 90 days after the acquisition and provided his or her "best efforts" to assist in the transition.

The transition agreements were conceived by Carrier's president, who is not a party to the action, to help retain ICP customers, ensure a smooth transition and continuity of ICP's business, and win needed antitrust approval. In exchange for receiving payments under the agreements, the ICP executives were to "cooperate fully with Carrier on all matters required to bring the [tender offer] to closing" and "successfully solicit ICP shareholders." (*See* Pl.'s Mem. in Opp. to Mot. for Summ. J., Docket Entry No. 109, at 21). Payment under the transition agreements was contingent on the success of the tender offer and UTC's acquisition of ICP.

Plaintiff alleges that the transition agreements were a facade. He contends that the agreements were nothing more than payments to ICP's management to induce them to solicit shareholders to ten-

der stock to UTC. *See, e.g., id.* at 21–23. Thus, Plaintiff asserts that the ICP executives who received transition agreements actually did nothing, except solicit shareholders for UTC, that they were not already obligated to do under the terms of their existing employment agreements with ICP. *See id.* Plaintiff does not cite any deposition testimony or other hard evidence in support of his assertion. Rather, he alleges, "[t]he contemporaneous circumstances also show that UTC intended the transition payments to be compensation for supporting the Tender Offer." *Id.* at 23. Plaintiff finds support for this theory in the fact that, "[r]emarkably, every executive at ICP who received these awards tendered all of their shares . . . ." *Id.* at 24.

Defendants refute this allegation and point to the fact that all UTC and then-ICP executives involved in the transition agreements contend that the agreements were legitimate compensation for work performed during the transition and deny that they were intended to provide additional consideration for the ICP executives' shares. Defendants contend that the record contains no evidence to the contrary.

## IV. *ANALYSIS*

Plaintiff, who held 10,000 shares of ICP common stock, tendered his stock in accordance with the terms of the tender offer. Plaintiff alleges that the March 15, 1999, golden parachutes and the transition agreements entered into by ICP and UTC with the ICP executives violated Section 14(d)(7) of the 1968 Williams Act Amendments (the "Williams Act") to the Exchange Act of 1934 and Rule 14d–10 promulgated thereunder, 17 C.F.R. § 240.14d–10—which together are known as the Best Price Rule.

### A. *Overview of the Best Price Rule*

■ Under Section 14(d)(7) of the Williams Act: "Where any person varies

the terms of a tender offer . . . before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are . . . [tendered] pursuant to the tender offer . . . ." 15 U.S.C. § 78n(d)(7). Rule 14d–10 provides, "no bidder shall make a tender offer unless . . . [t]he consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder *during* such tender offer." 17 C.F.R. § 240.14d–10(a) (emphasis added). The Rule is, on its face, "aimed at conduct during the pendency of the tender offer." *Walker v. Shield Acquisition Corp.,* 145 F.Supp.2d 1360, 1375 (N.D.Ga. 2001).

In order to determine whether consideration was paid during a tender offer, of course, one must determine when the tender offer commenced. Rule 14d–2(a), promulgated under Section 14(d)(7), provides the method for answering this question: a tender offer commences at "12:01 a.m. on the date when the bidder has first published, sent, or given the means to tender to security holders." 17 C.F.R. § 240.14d–2(a).

■ Applying Rule 14d–2(a) to the instant case, UTC's tender offer for ICP commenced on June 30, 1999, and ended on August 9, 1999. The parties do not dispute that the awards to top ICP executives that allegedly constituted improper consideration for their shares was promised before the tender offer commenced and paid after its expiration and ICP's merger into UTC's Carrier subsidiary. Accordingly, "[t]he focus thus becomes what interpretation the [C]ourt should apply to the Rule 14d–10 language stating that the relevant time frame is 'during such tender offer.'" *In re Digital Island*

*Sec. Litig.*, 223 F.Supp.2d 546, 556 (D.Del. 2002). The Sixth Circuit has not squarely addressed the question whether awards to key executives in a merger following a successful tender offer may be considered to constitute additional consideration for their shares so as to trigger a right of recovery by other tendering shareholders under the Williams Act,[4] and there is a split among other courts as to the interpretation of this phrase. *See id.*

In *Epstein v. MCA, Inc.*, 50 F.3d 644 (9th Cir.1995), *vacated on other grounds*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), the Ninth Circuit expansively interpreted the Williams Act and adopted a flexible test for the definition of "tender offer" that focuses not on timing but on whether the transaction in question was an "integral part of [the] tender offer." *Id.* at 655. The plaintiffs in that case alleged that two insiders of the target corporation received additional, improper consideration for their stock pursuant to separate agreements before the tender offer commenced. The Ninth Circuit rejected the defendants' contention that the agreements were not

actionable because they occurred outside the tender offer period, holding that questions of fact as to whether the agreements were integral to the tender offer, though outside of it in time, precluded summary judgment.[5] Thus, under *Epstein*, bonus payments made to executives of a target company pursuant to golden parachute or other employment agreements may violate the Best Price Rule if they are meant as a "premium" to the executives "as an inducement to support the tender offer and tender [their] own shares" and are "integral" to the tender offer, even if the agreements were executed prior to the tender offer's commencement. *Id.* at 659.

At least one lower court outside the Ninth Circuit has followed *Epstein*'s approach in an unpublished opinion. *See generally Millionerrors Inv. Club v. Gen. Elec. Co.*, 2000 WL 1288333 (W.D.Pa. March 21, 2000). The Second Circuit has cited *Epstein* for the proposition that the timing provisions of the Best Price Rule should be interpreted flexibly, *see Gerber v. Computer Assocs. Int'l, Inc.*, 303 F.3d 126, 135 (2d Cir.2002),[6] but it has not en-

---

**4.** In *Priddy v. Edelman*, 883 F.2d 438 (6th Cir.1989), the Sixth Circuit affirmed the district court's dismissal of shareholder litigation, including a Williams Act claim, but the Circuit did not address the substantive issues of the lower court's dismissal of the Williams Act claim. Rather, the court ruled that because the plaintiff appellant failed to appeal the summary judgment ruling on his Section 14(d)(7) claim in his opening brief, the court would not review the ruling.

**5.** *Epstein* involved only one transaction—the tender offer—whereas the instant case and most cases adopting a rule contrary to that espoused by the Ninth Circuit involve both a tender offer and a subsequent merger. The Ninth Circuit acknowledged this significant factual difference. *See Epstein*, 50 F.3d at 659 n. 21.

**6.** Plaintiff relies in part on *Gerber* in his motion to dismiss, but that reliance is misplaced. Although the Second Circuit in *Gerber* distin-

guished *Lerro* on the basis of factual differences in the cases and invoked *Epstein*'s standard, the facts of *Gerber* distinguish it in significant ways from this case and make it clear that its holding does not lend support to Plaintiff's expansive interpretation of the Best Price Rule. In particular, in Gerber, the court found (1) that the non-compete agreement at issue was entered into one day before the formal commencement of the tender offer, roughly one week after press releases by the bidder and target announcing the intent to start the tender offer, which the court determined actually commenced the tender offer under Rules 14d–10 and 14d–2; and (2) that the officer benefitting from the agreement was the founder of the target company and owned 25 percent of its stock. *See generally* 303 F.3d 126. Under those facts, the Court would agree with the Second Circuit that genuine issues of fact would exist for trial on the question whether the non-compete agreement was intended to compensate the recipi-

dorsed the *Epstein* standard. Indeed, as the Court discusses at pages 20 and 21, *supra*, the Second Circuit's approach to the Best Price Rule seems at odds with that espoused by the Ninth Circuit.

In contrast, the Seventh Circuit, in an opinion affirming a district court's dismissal of a case under the Williams Act, rejected the standard enunciated in *Epstein*[7] and held that transactions or agreements made before the commencement of a tender offer do not, as a rule, occur "during the tender offer." *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 243 (7th Cir.1996). In *Lerro*, the plaintiff challenged benefits granted to a controlling shareholder in an agreement executed before the commencement of the tender offer. The Seventh Circuit rejected the plaintiff's argument that this constituted extra compensation in violation of the Williams Act, despite the court's assumption that the agreement was "integral to the transaction." *Id.* at 244. According to the court, the provisions of Rule 14d–2(a), defining when a tender offer begins, set a temporal limit to Best Price Rule actions: "[b]efore the offer is not 'during' the offer". Many cases ... tell us to respect the language of the securities statutes and regulations. The difference between 'during' and 'before' ... is not just linguistic. *Id.* at 243 (citations omitted). Because the contested agreement occurred before the commencement of the tender offer, the Seventh Circuit affirmed the lower court's dismissal of plaintiff's Williams Act claims.

Thus, *Lerro* establishes the bright-line rule that "the protections in Section 14(d)(7) and Rule 14d–10 apply only to transactions between the commencement

and expiration of the actual tender offer period." *Walker*, 145 F.Supp.2d at 1371. Applying that rule, the Seventh Circuit held that whether or not challenged consideration was integral to the tender offer was irrelevant for purposes of Rule 14d–10. *See Lerro*, 84 F.3d at 244.

A number of courts accord with *Lerro* or have expressly adopted it in lieu of other interpretations of the Best Price Rule. Within the Sixth Circuit, the Eastern District of Michigan has held that target company shares bought by an acquiring company before commencement of the tender offer do not establish a minimum price for shares bought during the tender offer, and thus agreements with shareholders entered into separately from and before the tender offer do not violate the Best Price Rule. *See Priddy v. Edelman*, 679 F.Supp. 1425, 1431–32 (E.D.Mich.1988), *affirmed on other grounds*, 883 F.2d 438 (6th Cir. 1989). Other courts also have followed *Lerro*'s approach. *See, e.g., Digital Island*, 223 F.Supp.2d 546 (reviewing *Epstein*, *Lerro*, *Walker*, and *Kramer*, concluding that "*Lerro* and its progeny reach the better reasoned result," and granting motion to dismiss Williams Act claims on the ground that no compensation was made during the pendency of the tender offer).

Even within the Ninth Circuit, the Central District of California has questioned *Epstein*'s precedential authority and distinguished it on facts similar to those at issue in the instant case. *See McMichael v. U.S. Filter Corp.*, 2001 WL 418981, *4–6 (C.D.Cal. Feb.23, 2001). In *McMichael*, as here, the court was confronted with a shareholder class action alleging that pay-

---

ent for foregoing business opportunities or for tendering his large block of shares. Neither those facts nor any similar are present in the instant case, however.

**7.** Indeed, the Seventh Circuit noted, "*Epstein* lacks precedential value; the Supreme Court

vacated the judgment after concluding that the ninth circuit should not have reached the merits in light of a prior settlement of class litigation in Delaware." *Lerro*, 84 F.3d at 243.

ments made to target company directors under golden parachute employment contracts were an "integral part" of the bidder's tender offer, made to induce the directors to endorse the transaction and tender their shares. *Id.* at *4. Granting the defendants' motion to dismiss, the court stated that *Epstein* "did not address the issue of payment of preexisting obligations to executives of the target company," and held that "because the payments in question were no more than golden parachute payments, which were disclosed to shareholders, they were not additional consideration, and Defendants have not violated Rule 14d–10." *Id.* (internal citation omitted). Although the court noted that the golden parachutes last enacted before the tender offer did not differ from those previously enacted, which is not the case here, the court based its ruling largely on a factor that mirrors one of Defendants' contentions in the instant case: (1) that the acquiror, "in acknowledging the payments in the ... employment agreements, was doing no more than recognizing [the target corporation's] preexisting duty to pay its executives"—an obligation that "preexisted the tender offer." *Id.* at *6.

Similarly, in the absence of Eleventh Circuit precedent, the Northern District of Georgia also has adopted *Lerro. See Walker,* 145 F.Supp.2d 1360. *Walker* is important because the court in that case was confronted with facts strikingly similar to those at issue in the instant case. There, the defendants contended that because retention and transition awards were promised before the tender offer commenced and paid after it expired, they could not have constituted additional compensation to the target company's executives in violation of Rule 14d–10(a)(2). *See id.* at 1365. In response, the plaintiff alleged that the agreement to pay the change in control and transition bonuses

"was an integral part of the Tender Offer, specifically by linking the agreement to pay the awards to the [target] Insiders' endorsement of the Tender Offer. Consequently, Plaintiff asserts that the [bonus agreements] and the Tender Offer should be viewed as one integrated transaction." *Id.* at 1366. Under the plaintiff's theory in *Walker,* the awards occurred during the tender offer for purposes of Section 14(d)(7) and Rule 14d–10(a)(2).[8] *See id.*

The *Walker* court found *Lerro* to be the most persuasive interpretation of the Williams Act. Further, as in the instant case, the court found *Lerro* most factually similar, because it involved both a tender offer and a short-form merger governed by state law. The court also was persuaded by the Second Circuit's interpretation of the Best Price Rule, which accords with *Lerro. See Kramer v. Time Warner, Inc.,* 937 F.2d 767 (2d Cir.1991) (holding that benefits received by executives in second-step statutory merger following tender offer did not constitute additional consideration for their shares in violation of the Williams Act because the tender offer and merger were separate transactions and the benefits were promised by the target corporation, not the buyer); *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47 (2d Cir. 1985) (holding that privately negotiated, open-market purchases—commonly known as "street sweeps"—for target's stock made hours after the conclusion of a tender offer do not violate the Williams Act).

As the *Walker* court stated, "[t]he holding in [these cases] illustrates the principle that transactions near in time to the tender offer but outside it are a permissible feature in mergers and acquisitions that do not constitute a [de facto] tender offer ... under Section 14(d) of the Williams Act." 145 F.Supp.2d at 1370. Indeed, the court went so far as to state that *Lerro* establishes a bright-line rule that consideration

**8.** In the instant action, Plaintiff's theory is essentially the same.

due pursuant to agreements executed by a target company and its executives before the commencement of a tender offer, and paid by the acquiror following the conclusion of the tender offer, does not violate the Williams Act. *Id.* at 1371. Applying these cases to the facts before it, the court dismissed Plaintiff's claims. *See id.* at 1375 (holding that "the promise to pay and actual payment of the retention and transition awards were both outside the tender offer period. As such, both fall outside of the scope of § 14(d)(7) and Rule 14(d)–10 .... Accordingly, Plaintiff cannot state a claim as a matter of law under § 14(d)(7) and Rule 14(d)–10(a)(2)'").

Like the *Walker* court, the Court finds "no language in the administrative or legislative history supporting the expansive reading of § 14(d)(7) and Rule 14(d)–10 proposed by Plaintiff." *Id.* at 1376.[9] The Court agrees with the Second and Seventh Circuits and the courts adopting their similar interpretation that the approach suggested in *Epstein* "would encourage litigation and court intervention over every agreement executed concommitantly with a merger and acquisition, particularly those which provide compensation to key employees in the event of a take-over. In a business setting, it is impracticable to leave the validity of such agreements and the legality of ensuing tender offers subject to endless litigation." *Walker*, 145 F.Supp.2d at 1378. "With millions or even billions of dollars at stake, precise definition of the [offer] period is essential, and the SEC has accordingly consistently differentiated actions 'during' an offer from those close to the offer's beginning or end. The line is arbitrary, to be sure; ... but some line is essential, and it had best be a bright one." *Lerro*, 84 F.3d at 243.

Nevertheless, at an earlier stage of the instant litigation, Judge Haynes elected not to adopt the Seventh and Second Circuit interpretation of the Best Price Rule and instead adopted *Epstein* as the interpretation of the Williams Act under which it denied Defendants' Motion to Dismiss. Therefore, *Epstein* has been the law of the case.

## B. *The Law of the Case*

Because the Sixth Circuit has not squarely addressed the question of wheth-

9. The *Walker* court's discussion of the policy implications of an expansive versus a bright-line interpretation of the Williams Act is worth quoting at length, for the Court agrees with them whole-heartedly:

> Lastly, a narrow reading of these provisions supports a strong policy argument of providing clarity and finality for mergers and acquisitions. In connection with the amendments to the best price provisions in the 1980s, including the adoption of Rule 14d–10, the SEC recognized "a need to provide clarity and certainty in the regulatory scheme applicable to tender offers with respect to equal treatment of security holders." Defendants maintain, and this court agrees, that no clarity or certainty will follow "if the applicability of the state and rules is controlled by an inherently subjective analysis .... Such a construction makes every tender offer the certain object

of, and easy prey for, protracted and expensive litigation."
145 F.Supp.2d at 1377.

Commentators also have emphasized the harmful results of adopting the expansive application of the Best Price Rule espoused in *Epstein:* "Recent judicial opinions have allowed Rule 14d–10 to be applied to employment agreements between bidders and target company executives, on the theory that the agreements represent disguised compensation for the executives' tender. Such applications have allowed specious allegations to reach trial where they carry huge settlement values, and have therefore hampered the utility of tender offers as acquisition vehicles." *See* Ben Walther, *Employment Agreements and Tender Offers: Reforming the Problematic Treatment of Severance Plans under Rule 14d–10*, 102 Colum. L.Rev. 774, 789–90 (2002) (criticizing *Epstein* and the previous opinion in the instant case).

er awards to key executives in a merger following a successful tender offer may be considered to constitute additional consideration for their shares so as to trigger a right of recovery by other tendering shareholders under the Williams Act, Defendants urged Judge Haynes to adopt the approach taken to Best Price Rule cases by the Seventh Circuit in *Lerro* when they moved to dismiss the Complaint. (*See* Defs.' Mot. to Dismiss, Docket Entry No. 9). Judge Haynes instead elected to adopt the approach to Best Price Rule cases espoused by the Ninth Circuit in *Epstein,* which extends the Best Price Rule's requirements to payments made before the commencement of a tender offer, where such payments are "integral to the tender offer." (*See* Order and Mem., Docket Entry No. 30).

In selecting *Epstein* 's expansive interpretation of the Best Price Rule in lieu of *Lerro* 's bright-line test, Judge Haynes emphasized that "[a] guiding rule for this Court is the overarching principle that the securities laws are remedial in nature and are to be broadly construed to achieve the statutes' purposes." *See id.,* at 18 (citing *Pinter v. Dahl,* 486 U.S. 622, 652, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)). Thus, Judge Haynes "eschew[ed] the technical time deadlines" that might have precluded Plaintiffs' claims as a matter of law in favor of a very liberal interpretation of the Williams Act under *Epstein.* Ordinarily, therefore, in ruling on Defendants' Motion for Summary Judgment, the Court also would follow *Epstein,* under the doctrine of the law of the case. *See Moses v. Business Card Exp., Inc.,* 929 F.2d 1131, 1137 (6th Cir.1991).

 "As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460

U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). This rule promotes the finality and efficiency of the judicial process by protecting against the relitigation of settled issues. *Christianson v. Colt Indus. Op. Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citation omitted). The doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions. *Id.* In essence, the law of the case doctrine precludes a court from "reconsideration of identical issues." *Petition of U.S. Steel Corp.,* 479 F.2d 489, 493 (6th Cir.1973).

 Nevertheless, the doctrine merely expresses the general practice of courts and is "not a limit to their power." *Christianson,* 486 U.S. at 817, 108 S.Ct. 2166. "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous ....' " *Id.* (quoting *Arizona,* 460 U.S. at 618 n. 8, 103 S.Ct. 1382) (holding that court "did not exceed its power in revisiting the ... issue, and once it concluded that the prior decision was 'clearly wrong' " was not bound by it). According to the Second Circuit, a court should disregard the law of the case when it "has 'a clear conviction of error' with respect to a point of law on which [a] previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir. 1981). Thus, a court is not foreclosed from reconsidering issues of fact or law previously decided by it or a coordinate court. *United States v. Todd,* 920 F.2d 399, 403 (1990); *cf. Bowling v. Pfizer, Inc.,* 132 F.3d 1147, 1150 (6th Cir.1998) (recognizing that the law of the case doctrine is discretionary when applied to a court's own decisions or those of a coordinate court, but stating that a court cannot depart from a

decision that the Circuit Court already has affirmed).

According to the Sixth Circuit, the law of the case doctrine "is 'directed to a court's common sense' and is not an 'inexorable command.'" *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir.1997) (quoting *Petition of U.S. Steel Corp.*, 479 F.2d at 493). Rather, "the doctrine is a discretionary tool available to . . . promote judicial efficiency," and as such, "a decision to reconsider a previously decided issue will be deemed erroneous only if it is shown that the [second] court abused its discretion." *Todd,* 920 F.2d at 403. Indeed, the Sixth Circuit has expressly rejected the approach of other circuits that have limited a court's discretion to revisit issues previously decided in the same case. *Id.* (stating, "We do not think that such limitations are warranted. It is within the sole discretion of a court to determine if a prior ruling should be reconsidered.").

In the instant matter, the Court disagrees with the adoption of *Epstein* as the rule governing issues in this case. While the securities laws may be construed broadly to effectuate their remedial purpose, that instruction is not a license to read specific language out of the statutes. Further, the Court does not believe it must find that the selection of *Epstein* was erroneous in order for the Court to reject *Epstein* in favor of interpretation espoused by the Seventh and Second Circuits at this summary judgment stage of the proceedings.

The Sixth Circuit has stated three reasons to reconsider a prior ruling: (1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by controlling authority; or (3) where a decision is clearly erroneous and

would work a manifest injustice. *See Hanover Ins. Co.,* 105 F.3d at 312. No new evidence has surfaced, nor has the Sixth Circuit issued a controlling opinion rejecting *Epstein.*[10] Nor would retaining *Epstein* as the governing rule in this case work a manifest injustice. However, the Court is not reconsidering Judge Haynes' decision not to grant Defendants' Motion to Dismiss, but rather, whether the interpretation enunciated in *Epstein* is the proper standard to apply to the instant motion and in future shareholder lawsuits under the Best Price Rule of the Williams Act.

Having carefully considered the issues, the Court believes that *Lerro* and those cases in accord with its interpretation state the proper standard in Best Price Rule cases. *Accord Walker,* 145 F.Supp.2d at 1367 (adopting *Lerro* over *Epstein* in the absence of controlling Eleventh Circuit precedent and stating, "the court is not persuaded by *Epstein*'s broad holding that in each case, transactions occurring prior to the beginning of the tender offer must be examined to determine if they should be deemed 'integral' to the tender offer"). Therefore, because the Court is loathe to adopt what it believes to be an erroneous standard as the law of this District, the Court shall exercise its discretion and adopt the standard of *Lerro* in place of *Epstein* as the basis of the Court's analysis in the instant case.

## C. *Defendants' Motion for Summary Judgment is Granted*

To avoid summary judgment, Plaintiff must allege the existence of a genuine issue of material fact with respect to each of the following four elements in order to establish a violation of the Best Price Rule, pursuant to Section 14(d)(7) and Rule 14d–10 of the Williams Act: (1) that the bidder, (2) during the pendency of

10. Neither, of course, has the Sixth Circuit endorsed *Epstein* in any way.

the bidder's tender offer, (3) purchased a security that is the subject of the tender offer, (4) for more consideration than the bidder paid to other shareholders pursuant to the tender offer. *See Walker*, 145 F.Supp.2d at 1375; *Kahn v. Virginia Ret. Sys.*, 783 F.Supp. 266 (E.D.Va.1992).

### 1. The Change in Control Agreements Did Not Violate the Best Price Rule

■ Applying *Lerro* and the elements of the Best Price Rule to the facts at hand, it is clear that Plaintiff has failed to establish a genuine issue as to whether the alleged additional compensation paid to the ICP executives occurred during the period of the tender offer. Thus, summary judgment is appropriate.

No variation in share price occurred during the tender offer. The golden parachutes executed by ICP's Board for its executives, which Plaintiff alleges were ratified solely to camouflage improper consideration for the executives' stock, were adopted by ICP on March 15, 1999, prior to UTC's initiation of the tender offer on June 30. UTC's payment of the change in control bonuses, which UTC was contractually obligated to honor, occurred after the tender offer had expired on August 9 and UTC had merged ICP into its Carrier subsidiary on September 7. "Thus the promise to pay and actual payment of the retention and transition awards were both outside the tender offer period. As such, both fall outside the scope of § 14(d)(7) and Rule 14(d)–10 ...." *Walker*, 145 F.Supp.2d at 1375. Accordingly, summary judgment is warranted as to Plaintiff's Williams Act claim based on the compensation paid to the former ICP executives pursuant to the March 1999 golden parachutes.

### 2. In the Alternative, the Change in Control Agreements Did Not Violate the Best Price Rule Under *Epstein*

■ For the foregoing reasons, the Court has adopted the approach to the Best Price Rule enunciated in *Lerro* and its progeny and, applying that standard to the facts before it, has determined that summary judgment is warranted on the golden parachutes claim. Nevertheless, in the interests of clarity and comprehensiveness, the Court will briefly detail why it finds, in the alternative, that summary judgment on the claim is proper even under *Epstein*'s expansive approach to the Williams Act.

First, despite Plaintiff's efforts to dilute further *Epstein*'s already malleable standard, it is not sufficient under that approach merely to allege that the golden parachute agreements were "entirely conditional upon on," (*See* Pl.'s Mem. in Opp. to Mot. for Summ. J., Docket Entry No. 109, at 28), or otherwise "integral to the Tender Offer." *Id.* at 36. Indeed, Plaintiff goes so far as to contend that it is irrelevant that there is not a scintilla of proof that Defendants participated in ICP's execution of the March 1999 golden parachutes, since he seems to theorize that merely *"the fact that UTC conditioned payment* [under the golden parachutes] *on a successful tender offer"* is sufficient to establish a genuine issue on the question of liability. *Id.* at 49.

Clearly, however, whether UTC's intention to make payments under ICP's golden parachute agreements with its executives was conditioned upon the success of the tender offer is only one part of the Best Price Rule inquiry.[11] In addition, Plaintiff

---

**11.** The Court notes that as with many of Plaintiff's allegations, this seems hardly nefarious. After all, one wonders, why would a bidder contemplate making payments to a target's executives, pursuant to agreements between the target and the executives, unless the bidder succeeded in acquiring the company, thus inheriting its contractual obligations? The same question could be asked of Plain-

must show that the agreements were intended as consideration to induce the executives to tender their shares and support the tender offer. *See Epstein*, 50 F.3d at 652–59. While questions of intent and motivation normally should not be decided at the summary judgment stage but rather reserved for trial, in the instant case, Plaintiff has failed to produce a scintilla of evidence to support the allegation that the golden parachutes were intended to induce ICP's management to tender their shares, which collectively constituted only some one percent of ICP's stock, to UTC, which already had secured over 40 percent of the stock in lock-up agreements. Indeed, the allegation seems even weaker in light of the fact that the golden parachutes were enacted by ICP and not UTC, the bidder, and that UTC made payments pursuant to them as part of the contractual obligations it assumed after acquiring ICP.[12] Thus, under *Epstein*, Plaintiff could defeat summary judgment on its claim that the golden parachutes violated the Williams Act only by alleging sufficient facts to establish a question whether UTC was involved in the ICP Board's adoption of the agreements.

Indeed, applying *Epstein*, Judge Haynes said as much in his earlier opinion. In denying Defendants' Motion to Dismiss, Judge Haynes acknowledged that "as a general rule, incentive contracts between a company and its key officers and executives are not subject to Section 14(d)(7)." (*See* Docket Entry No. 30, at 20–21). Judge Haynes upheld Plaintiff's claims despite that general rule because he was obliged to accept Plaintiff's allegations that the ICP golden parachutes were enacted at UTC's urging and as an express part of the tender offer. *See id.* (stating that

"construing the factual allegations in a light most favorable to plaintiff as is required by this type of motion, the Court concludes that these agreements could be found to have been induced by [UTC] as part of its tender offer for ICP and not as contracts solely between ICP and its officers").

Critically for Plaintiff's case under Judge Haynes' reasoning and *Epstein*, however, he has now withdrawn those allegations, either formally in the Amended Complaint or in effect, by alleging theories in opposition to the Motion for Summary Judgment that are flatly contradictory to the allegation that UTC was involved in the adoption of the golden parachutes. Indeed, far from contending that UTC orchestrated the golden parachutes, Plaintiff now alleges (and is supported in its assertion by ample evidence) that UTC first "uncovered" those agreements during due diligence months after they were adopted, and that they at first "were a source of contention" between ICP and UTC. (*See* Pl.'s Mem. in Opp. to Mot. for Summ. J., Docket Entry No. 109, at 18).

Courts consistently reject Williams Act claims based on similar facts, where the acquiror was not involved in the ratification of the agreements. *See, e.g., Walker,* 145 F.Supp.2d at 1360–66; *Digital Island,* 223 F.Supp.2d at 556; *McMichael,* 2001 WL 418981, at *6; *cf. Karlin v. Alcatel,* 2001 WL 1301216, at *4–5 (denying summary judgment based on specific evidence that acquiror was involved in adoption of new stock options to dominant shareholders, which were contingent on success of tender offer, two days after reaching a preliminary merger agreement with acqui-

---

tiff's allegations concerning that feature of the transition services agreements.

**12.** As a matter of law, an acquiror does not violate the Best Price Rule where it "merely

recognized a preexisting duty" of the acquired company and honored employment agreements executed by the target. *McMichael,* 2001 WL 418981, at *6.

ror). *Epstein* itself lends little support to Plaintiff's case, given in that case, the acquiror consulted with the target and expressly approved its grant of new stock options to a dominant shareholder on the day the tender offer was announced. 50 F.3d at 658.

Finally, Plaintiff attempts to rescue his claim on the golden parachutes from summary judgment by simultaneously and paradoxically asserting that although UTC first learned of the agreements months after they were adopted by ICP, the Court nevertheless should infer that UTC somehow was involved in the agreements from the outset. Plaintiff supports the latter contention by pointing to the alleged destruction of evidence by UTC, evidence that Plaintiff claims might support the second of its self-contradictory assertions. Although the Court reserves judgment as to Plaintiff's Motion for Sanctions for alleged spoliation, it notes that such a theory still would not undercut the many grounds supporting summary judgment on the golden parachutes claim (stating, "[w]e do not suggest that the destruction of evidence, standing alone, is enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim.") *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir.1998).

### 3. The Transition Services Agreements Did Not Violate the Best Price Rule

■ Similar deficiencies are fatal to Plaintiff's theory that UTC's transition services agreements with the former ICP executives violated the Best Price Rule, even under the *Epstein* standard.[13] The Court finds nothing in the record to support an inference or genuine question that UTC executed the transition agreements to induce ICP's management to tender their shares. While Plaintiff argues that "a jury could ... reject defendants' explanations for the agreements," (Pl.'s Mem. in Opp. to Summ. J., Docket Entry No. 109, at 44), this contention alone cannot justify continuing the litigation. Indeed, if that were all that were required to defeat summary judgment, no case could be dismissed before trial. Plaintiff alleges nothing that would support a finding that the transition agreements violated the Williams Act. Plaintiff's argument essentially boils down either to an unsupported assertion that the true motivation for the agreements was to induce the executives to tender their shares, *see Harris v. Intel Corp.*, 2002 WL 1759817, at *9, *vacated on other grounds*, 2002 WL 31548118 (N.D.Cal. Oct.10, 2002) (granting summary judgment on essentially the same facts and stating, "[o]n the critical question of Defendants' motivation for the payments, however, Plaintiffs have not raised a dis-

---

**13.** Because some transition agreements were executed by UTC during the pendency of the tender offer, they fall within the appropriate period for an actionable claim under *Lerro* and satisfy one element of a violation of the Best Price Rule. Although the district court in *Walker* dismissed similar claims for not only golden parachute but also transition services bonuses, the court based its reasoning not only on the fact that the bonuses under both agreements were paid after the tender offer concluded, as is the case here, but also on the facts that the target entity rather than the acquiror executed the transition awards and that the agreements were executed before the

tender offer commenced. 145 F.Supp.2d at 1375. In the instant action, unlike the golden parachute agreements, the transition services agreements were executed by UTC during the tender offer. Thus, in its analysis of the transition services agreements, the Court must determine—not merely as an alternative analysis but as the principal consideration— whether Plaintiff has shown that a genuine issue of material fact exists for trial that UTC intended the transition agreements as consideration to induce the executives to tender their shares and support the tender offer. *See Epstein*, 50 F.3d at 652–59.

puted question of material fact"), or to a contention that the agreements were unjustified by the circumstances or otherwise wasteful—a contention that may or may not possess merit, but which is a question of business judgment and corporate law that is beyond the scope of this lawsuit.[14] In either case, summary judgment on Plaintiff's transition agreements claim is appropriate. *See Id.* at *9–10 (granting summary judgment because plaintiff failed to establish a dispute as to whether the acquiror intended executive bonuses under golden parachutes and transition agreements to serve as compensation and an inducement to tender stock, and stating that "unlike *Epstein* . . . the circumstantial evidence here is not sufficient to undermine the documented rationale for the bonus plan . . ." despite an "inconsistency in [d]efendants' explanation for the" bonuses.)

### 4. The Individual Defendants Are Entitled to Summary Judgment

 Plaintiff named two officers of UTC—Mssrs. Trachsel and Bousbib—as individual Defendants in the initial Complaint. In his Amended Complaint, he added Mssrs. Messina, Renaud, and Fitzpatrick. In neither, however, does he state a legally sufficient claim against the individual Defendants. Indeed, Plaintiff scarcely mentions the individual Defendants at all, except to allege that Mssrs. Bousbib and Trachsel violated the Best Price Rule by "approv[ing] the Tender Offer" and signing Titan's Schedule 14D–1 tender offer statement filed with the SEC, and that Mssrs. Messina, Renaud, and Fitzpatrick, as members of UTC's acquisition review committee, endorsed a capital appropriation request that specifically mentioned ICP's March 1999 golden parachutes. (*See* Pl.'s Amended Complaint, Docket Entry No. 78 at ¶¶ 13–17). At any rate, even had the Court denied summary judgment as to UTC and Titan, Plaintiff's claims against the individual Defendants are not actionable for the simple reason that the Best Price Rule applies only to a "bidder," not to its employees.

Rule 14d–10's strictures apply on to a "bidder" that "make[s] a tender offer." 17 C.F.R. § 240.14d–10(a)(2). Courts have consistently applied the Best Price Rule only to the bidder itself, and not to individual officers or directors. *See, e.g., Katt v. Titan Acquisitions, Ltd.,* 133 F.Supp.2d 632, 634 (M.D.Tenn.2000) (stating that "[t]he 'Best Price Rule' requires a company making a tender offer to pay all tendering shareholders the same price for their shares"); *Digital Island,* 2002 WL 31015632, at *10 (dismissing claims against individual defendants and noting that "Rule 14d–10 . . . is applicable by its terms only to a bidder"); *cf. Padilla v. MedPartners, Inc.,* 1998 U.S. LEXIS 22839, at *12 (C.D.Cal. July 27, 1998) (upholding Best Price Rule claims against individual defendants on the basis of "controlling person" status, where plaintiff alleged that they "controlled [the bidder] and caused [it]" to unlawfully provide additional compensation for tendered shares).

In this case, none of the individual Defendants constituted "bidders" or "tender offerors" for ICP's shares. Plaintiff alleg-

---

**14.** Plaintiff also alleges that the transition services agreements were improper because they were conditioned on the executives' soliciting other ICP shareholders to tender their shares. Again, however, even if true, this assertion is insufficient to establish a genuine issue for trial unless coupled with evidence that UTC intended the agreements as compensation to induce the executives to tender their *own* shares. Further, as Defendants point out, if the true motivation behind the agreements was to obtain the shares of these executives in the tender offer, then it would seem that UTC committed a huge oversight by not requiring the executives to enter into lock-up agreements.

es nothing to the contrary. Nor does he assert any claims against the individual Defendants based on alleged "controlling person" status. *See Padilla,* 1998 U.S. LEXIS 22839, at \*12. Pursuant to 15 U.S.C. § 78t(a), a plaintiff must specifically plead controlling person liability. Plaintiff has not done so. Thus, Plaintiff fails to allege an actionable claim against the individual Defendants, and summary judgment is warranted as to the claims against them, independent from the Court's entry of summary judgment as to Plaintiff's claims against UTC and Titan.

### D. *Plaintiffs' Motion for Additional Discovery is Denied*

Plaintiff invokes Federal Rule of Civil Procedure 56(f) and moves the Court, if it is inclined to grant Defendants' Motion for Summary Judgment in reliance in whole or in part on certain declarations submitted by Defendants, instead to continue the case for further discovery. (Docket Entry No. 114). In support of the Motion, Plaintiff contends that Defendants' Motion for Summary Judgment is premature because Plaintiff has not deposed the individuals who submitted the declarations at issue, and because there is a reasonable basis to believe that information yet discovered exists that would rebut Defendants' arguments. *See Good v. Ohio Edison Co.,* 149 F.3d 413, 421 (6th Cir.1998); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir.1983).

According to Plaintiff, during discovery, he "sought to depose many of the individual declarants but were [sic] met with the limits on the number of depositions pursuant to Rule 30(a) of the Federal Rules of Civil Procedure or demands by another declarant (who is a resident of Canada) to be paid excessive fees for his deposition." (*See* Docket Entry No. 114, at 1). As Plaintiff himself concedes, however, "during discovery, ... Defendants accommodated plaintiff's request [to stipulate that

Plaintiff might exceed the limitation on depositions imposed by Fed.R.Civ.P. 30(a) ], but specifically objected to plaintiff deposing all of ICP's executives on the ground that doing so would be unreasonably cumulative." *See id.* at 2. Thus, Plaintiff chose to depose two ICP executives, Mssrs. Clevy and Cain. He now seeks to depose nine additional ICP executives.

In addition, Plaintiff seeks to depose Stanley Beck, who served on the Special Committee of ICP's Board and whose declaration concerning Defendants' intentions and the purposes of the contested agreements Defendants have submitted in support of the Motion for Summary Judgment. Because Plaintiff was entitled to depose Mr. Beck formally only under the strictures of the Hague Convention, he instead sought to depose Mr. Beck informally. After learning that Mr. Beck would charge his daily fee of $5000 to participate in the deposition, Plaintiff elected to postpone the deposition until after the Court's ruling on summary judgment. "Given Mr. Beck's unreasonable demands during discovery," Plaintiff now submits that he "should be entitled to take his deposition ... based upon the information provided in his declaration." *See id.*

Plaintiff's Motion is without merit. The parties already have completed two years of discovery, and the Court-imposed deadline for the completion of discovery has passed. Further, Plaintiff does not allege that he has discovered previously unknown witnesses whose deposition testimony might be crucial to his opposition to Defendants' Motion for Summary Judgment. Rather, Plaintiff asks the Court to continue this case in order to allow Plaintiff to depose individuals of whose existence he has known all along, and whom he elected not to depose for strategic reasons under Federal Rule of Civil Procedure 30(a).

Plaintiff initiated this case in July 1999, and the Court is strongly disinclined to delay its resolution barring a compelling justification. The Court finds that Plaintiff has not provided such a justification.

■ Granting a motion for additional discovery under Rule 56(f) is appropriate only if a "plaintiff had ample opportunity to discover evidence ... and there [was] no evidence of good cause for further extending discovery." *York v. Tenn. Crushed Stone Ass'n*, 684 F.2d 360, 363 (6th Cir.1982) (affirming denial of Rule 56(f) motion); *see also Reid v. State of New Hampshire*, 56 F.3d 332, 341 (1st Cir.1995) (stating that plaintiff seeking additional discovery under Rule 56(f) must "(1) articulate a plausible basis for the belief that discoverable materials exist which would raise a trialworthy issue and (2)demonstrate good cause for failure to have conducted discovery earlier") (citation omitted); *Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F.Supp. 869, 894 (S.D.N.Y.1997) (stating that "party seeking additional discovery must demonstrate with specificity all of the following: 1) the nature of the uncompleted discovery ...; and 2) how these facts are reasonably expected to create a genuine issue of material fact; and 3) what efforts the affiant has made to obtain these facts; and 4) why those efforts were unsuccessful").

Plaintiff does not show why the additional depositions he now seeks would raise a specific, genuine issue of material fact to defeat summary judgment. Nor does the Court believe that Plaintiff's strategic decision not to depose these individuals, either because of cost or the limitations imposed by Rule 56(f) (which Plaintiff concedes were relaxed by his stipulation with Defendants), constitutes "good cause for fail[ing] to have conducted discovery earlier." *Reid*, 56 F.3d at 341. Further, as Defendants point out, the Court already has granted discovery extensions in the last two years and, in its Third Amended Case Management Order (Docket Entry No. 80), required all fact discovery to be completed by June 4, 2002, and all expert discovery to be completed by September 20.

The Court finds no merit in Plaintiff's Motion. Therefore, it shall not grant his request to continue this action to allow him to depose additional witnesses.

### E. The Court Reserves Ruling on Plaintiffs' Motion for Sanctions

■ The Court reserves ruling on Plaintiffs' Motion for Sanctions, (Docket Entry No. 105), and expressly reserves ancillary jurisdiction over that motion. A federal court may consider collateral matters such as sanctions after an action has been terminated, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), and it may assert ancillary jurisdiction "to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The Supreme Court has cautioned that the doctrine of ancillary jurisdiction is limited to "matters ... that are incidental to other matters properly before [the court]." *Hartmarx Corp.*, 496 U.S. at 390, 110 S.Ct. 2447.

In the instant action, Plaintiffs' Motion for Sanctions clearly deals with a collateral matter that is incidental to the underlying securities claims of this action. It is well within the Court's discretion to deal with the sanctions issue after granting summary judgment. Therefore, despite its dismissal of all of Plaintiffs' claims and entry of final judgment on the merits, the Court will retain jurisdiction for the purpose of holding a hearing on Plaintiffs' Motion for Sanctions before ruling on the

Motion. *See, e.g., Hartmarx Corp.,* 496 U.S. at 396, 110 S.Ct. 2447 (holding that district court may award costs and attorney's fees and impose sanctions for contempt and under Rule 11 of the Federal Rules of Civil Procedure, even though action no longer pending); *see also Colaprico v. Sun Microsystems, Inc.,* 1994 WL 514029 (N.D.Cal.1994) (holding that document dispute under Protective Order is collateral to merits of the case and thus court retains ancillary jurisdiction over dispute after final judgment).

### V. *CONCLUSION*

Based on the foregoing, Defendants' Motion for Summary Judgment (Docket Entry No. 88) shall be GRANTED; Plaintiff's Motion for Additional Discovery in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket Entry No. 114) shall be DENIED; Plaintiff's Motion to Strike (Docket Entry No. 111) shall be DENIED as moot; and the Court shall reserve ruling on Plaintiff's Motion for Sanctions for Spoliation of Electronic Evidence (Docket Entry No. 105). This case shall be DISMISSED and the Court will preserve ancillary jurisdiction over Plaintiff's Motion for Sanctions and set a hearing on the Motion.

An appropriate Order will be entered.